John H. WILLIAMS, Plaintiff-Appellee,

v.

PENNSYLVANIA RAILROAD COMPANY, Defendant and Third-Party Plaintiff-Appellant,

v.

WILLIAM SPENCER & SON CORPORATION, Third-Party Defendant-Appellee.

Cal. No. 77, Docket 27684.

United States Court of Appeals Second Circuit.

Argued Oct. 30, 1962.

Decided Jan. 8, 1963.

---

James S. Rowen (Conboy, Hewitt, O'Brien & Boardman), New York City, for defendant and third-party plaintiff-appellant.

John Nielsen, New York City, (Perrell, Nielsen & Stephens), New York City (Thomas O. Perrell, New York City, of counsel), for third-party defendant-appellee.

Vincent J. Lumia, Brooklyn, N. Y. (Anthony S. Bottitta, Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Williams, an employee of Wm. Spencer & Son Corporation, stevedores, brought this action in the Supreme Court of New York, Kings County, against Pennsylvania Railroad Company, to recover for personal injuries sustained as a result of certain acts of a Pennsylvania Railroad "hoister" while he was unloading a barge; the complaint alleged negligence and unseaworthiness. The Pennsylvania removed the action to the District Court for the Eastern District of New York on the ground of diverse citizenship. There it answered and filed a third-party complaint against Spencer claiming indemnification for any sum recovered by Williams. Trial before Judge Rosling without a jury resulted in a $2500 judgment for Williams against the Pennsylvania and a dismissal of the third-party complaint. We affirm Williams' judgment against the Pennsylvania but vacate the dismissal of the Pennsylvania's claim against Spencer and remand for further proceedings as hereafter set forth.

Williams' injury occurred while he was aboard and engaged in unloading a barge, the "#114", belonging to the Lehigh Valley Railroad, which was moored in navigable waters at a Brooklyn pier. Tied up alongside the barge, and helping to unload it, was Pennsylvania hoister #218, a scow carrying a crane with a 10-ton lifting capacity. The cargo being unloaded from the barge consisted of four large 6-ton crates containing "payloaders". Staples were set into the upper surface of the machines at each of the four corners, and protruded through the top of the crate. Hooks on lines running from the boom of the hoister's crane would be fixed in the eyes of these staples, and the hoister would then lift the crate to the pier. Spencer's foreman, Alexander, was in charge of the unloading, in which five Spencer stevedores were engaged. Wall, whose general employment was with the Penn-

sylvania as "captain" of the hoister, operated the crane on signals from Alexander.

After three of the crates had been removed without incident, Williams mounted the last to attach the hooks to the staples. A part of another crate containing a rocker shovel, which was not to be removed, overhung one corner of this last crate and thereby prevented attachment of the fourth hook. In order to make that possible, Alexander decided to have the payloader crate slid out from under the overhang of the shovel, by means of the three hooks that had been attached, at a level slightly above the deck. With Williams remaining on the crate, Alexander signalled Wall to "boom up" slowly; Wall complied. When the crate was about a foot above the deck surface, Alexander motioned Wall to stop. But the crate rose a little higher and struck the nether surface of the overhang. The impact caused one of the staples to detach, and the freed hook then backlashed and hit Williams in the face, with the result that he was catapulted to the deck from the tilting load and sustained further injury.

In an opinion, the judge found in favor of Williams and against the Pennsylvania both on the ground that the hoister was unseaworthy, in that Wall was not equal in disposition and seamanship to ordinary men in the calling, and on the ground that Wall was negligent. He dismissed the claim over because the Pennsylvania's own negligence was "active". The Pennsylvania challenges the judge's conclusion based on unseaworthiness, argues that Wall was acting as Spencer's employee rather than its own so that liability for his negligence should rest solely on Spencer, and asserts that it is entitled to indemnity from Spencer if held liable to Williams. We find it un-

necessary to determine the contention with respect to unseaworthiness since we sustain the trial judge's conclusion as to negligence; with respect to indemnity our views differ from his.

## I. UNSEAWORTHINESS.

Referring to Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and Rich v. Ellerman & Bucknall S.S. Co., 278 F.2d 704 (2 Cir. 1960), the judge said, "The principle of Sieracki in light of the well reasoned gloss in Rich, supra, enfolds within its amplitude the factual situation which here confronts us wherein the vessel to be ruled unseaworthy is one other than the vessel upon which the effects of such unseaworthiness operate. Cf. Flanagan v. The H. F. Gilligan, 170 F.Supp. 217 (S.D.N.Y.1959)." What is critical, however, is not where the effect of the alleged unseaworthiness of the vessel operates, but upon whom.[1] Rich did not put a "gloss" on Sieracki in any respect relevant to that. Each was a longshoreman's suit against the owner of the vessel he was unloading; Rich differed from Sieracki only in that the unseaworthiness was not a defect in the ship's gear but one created by the stevedores themselves.[2] Neither does the Flanagan case, dealing with the claim of a barge captain against a tug, support so broad a conclusion as the judge seems to have drawn. Judge Bryan did not there disagree with the earlier statement by Judge Weinfeld in the same action, 170 F.Supp. 793, 794 (S.D.N.Y.1958), that "no case has gone so far as to hold that the doctrine [of recovery for unseaworthiness] extends to a non-crew member who does not perform a function traditionally performed by crew members with respect to the ship" sought to be charged; he held only that the libelant had put himself "within the contours of 'crew work' "

1. Compare, e. g., United N. Y. & N. J. Sandy Hook Pilots Assn. v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959), with, e. g., Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2 Cir. 1950), cert. denied, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951).

2. It was not novel even in that respect, see Grillea v. United States, 232 F.2d 919, 922–923 (2 Cir. 1956).

by alleging that at the time of his injury he "was acting as a 'lookout' for the tug," while intimating some doubt that the proof would substantiate this claim, since the libelant was aboard the barge rather than the tug.

■ "Absolute and nondelegable" as the duty to furnish a seaworthy ship is, it is still a duty "which the owner of a vessel owes to the members of the crew who man her." United N. Y. and N. J. Sandy Hook Pilots Assn. v. Halecki, 358 U.S. 613, 616, 79 S.Ct. 517, 518, 3 L.Ed. 2d 541 (1959). It is true, as the Halecki opinion continues, that Seas Shipping Co. v. Sieracki, supra, and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), "made clear that the shipowner could not escape liability for unseaworthiness by delegating to others work traditionally done by

members of the crew", but the reference is to the crew of the shipowner's ship, or persons doing their work, and not to the crew of another ship or persons doing their work, with whom the shipowner has no consensual relationship. Hence the status of the plaintiff in doing crew work for the Lehigh Valley barge, which he was aboard and engaged in unloading and by whose owner the services of his employer had been retained, would not in itself allow him to recover for the unseaworthiness of another ship, the Pennsylvania hoister. Any recovery by plaintiff for unseaworthiness of the hoister would have to rest rather on the basis that he might properly have been found to have been doing crew work for the hoister as well as for the barge. We are not required to pass on the issues that would be raised by such an argument, some of which we outline in the margin.[3]

3. The argument in favor of liability for unseaworthiness would run like this: A hoister, as a "ship", is somewhat of a maritime parasite; it makes its living by unloading other vessels and, being manned by only a single operator, requires the aid of workers aboard the ship it serves. Without men like Williams to affix lines from the boom to the cargo on the barge, the hoister would be incapable of doing its job. Hence Williams, while performing this service, was a "borrowed crewman," cf. Restatement of Agency, 2d, § 227 (1958), who came within the class protected by the Pennsylvania's duty to provide a seaworthy hoister. When the lifting mechanism used to unload a ship belongs to the ship itself, a longshoreman doing work identical to that done by Williams here, and suffering injury from an accident due to the crane's unseaworthiness, could recover against the owner of the ship being unloaded. See Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); American Export Lines, Inc. v. Revel, 266 F.2d 82 (4 Cir. 1959); Weigel v. The MV Belgrano, 189 F.Supp. 103 (D. Ore.1960). Williams, however, would have encountered difficulty if he had brought his action for unseaworthiness against the Lehigh Valley, since the crane that injured him was not a part of the barge's hull, gear or stowage, and might well not be an "appurtenant appliance" either, although we do not decide

that. Compare McKnight v. N. M. Paterson & Sons, 181 F.Supp. 434 (N.D. Ohio), aff'd, 286 F.2d 250 (6 Cir. 1960), cert. denied, 368 U.S. 913, 89 S.Ct. 189, 7 L.Ed.2d 130 (1961), and Fredericks v. American Export Lines, Inc., 227 F.2d 450, 454 (2 Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 475, 100 L.Ed. 855 (1956), with Petterson v. Alaska S.S. Co., 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), affirming 205 F.2d 478 (9 Cir. 1953); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954), reversing 205 F.2d 57 (2 Cir. 1953); and Considine v. Black Diamond S.S. Corp., 163 F.Supp. 107, 110 (D. Mass.1958). Yet, to the same extent as the hypothetical longshoreman on the ship possessing its own crane, he was "doing a seaman's work and incurring a seaman's hazards," and hence fell within the class of workers whose interests have dictated the shipowner's liability for unseaworthiness, a liability "owing to all within the range of its humanitarian policy"; the Pennsylvania, moreover, "is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its costs." Seas Shipping Co. v. Sieracki, supra, 328 U.S. 85, at 99, 95, 94, 66 S.Ct. 872 at 880, 877, 90 L.Ed. 1099. True, the same injury sustained in the same circumstances might not support recovery for unseaworthiness if the crane had been based on land. McKnight v. N. M. Paterson & Sons, supra. But nautically

Neither need we determine whether the judge was justified in concluding that Wall was an "unseaworthy" employee.[4] For we sustain his alternative holding that Williams was entitled to judgment against the Pennsylvania on the ground of negligence.

## II. NEGLIGENCE

▇ The Pennsylvania does not seriously challenge the judge's finding that Wall, knowing, as he did, of the risk of impact with the overhang and of the eccentric listing stress caused by the absence of the fourth hook, was negligent in raising the crate on which he saw Williams to be standing. Its defense to the negligence claim is rather that Wall was acting as Spencer's servant and not as its own. To support this position it relies on evidence that the Spencer foreman, Alexander, was in general charge of the unloading; that Wall raised the crate on Alexander's direction; that Alexander "hired" Wall to do the hoisting; that Wall held a Spencer identification card which stated that it "must be presented by you each time you are hired by us and each time you receive your pay check"; and that Spencer paid Wall $2.73 for each hour he spent in helping to unload the barge, as it also did for similar services before and after. As against this, the Pennsylvania paid Wall a monthly wage of $450, which was not diminished by any payments he received from Spencer. The judge remarked that it was "a puzzling thing at the close of the case not yet to have learned, how a man could possibly be paid by two separate employers under these circumstances, and not to have that question at least put by somebody so that the Court may know what the answer is." However, the parties made no attempt to satisfy this natural curiosity.

▇▇ The facts in the leading case of Standard Oil v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), where a winchman was held to have continued to be the servant of his general employer rather than coming under the employment of the stevedore whose signals he obeyed, bear a striking resemblance to those here—save for two elements which the Pennsylvania asserts to be vital dis-

unimpressive as the hoister may have been, it was maritime enough to make the Pennsylvania a "shipowner".

On the other hand, Williams was surely not a member of the hoister's "crew" in any traditional sense. Expansion of the concept of "crew work" to take in workers on vessels other than the one sought to be held as unseaworthy should not be done lightly, since such expansion might have extensive and presently unforeseen consequences for vessels which, like hoisters and the ships they unload, characteristically function in a symbiotic relationship—notably the tug and its tow in their many different relations. See, in addition to the two Flanagan decisions cited above, Upper Columbia River Towing Co. v. Glens Falls Ins. Co., 170 F. Supp. 705 (D.Ore.1959).

4. The judge evidently did not consider that Wall's negligent act in raising the crate when he knew Williams was on it sufficed to show that Wall was not equal in disposition and seamanship to the ordinary men in the calling. The conclusion was based rather on Wall's testimony that he would have followed instructions given by the Spencer foreman even if he "didn't agree with those instructions, or * * * thought that there was going to be something wrong"—a statement which, in the judge's view, evidenced "so reckless an attitude" as to "inevitably generate casualty" and to demonstrate that Wall "was either incompetently trained or had been trained in incompetence." We have some doubt that these strictures were deserved. The quoted language was in a question asked of Wall in the course of cross-examination on the subject of who was his employer; we would be inclined to read his answer—"Yes, because he employs me at that particular time"—as saying merely that he regarded Spencer as his employer and the Spencer foreman as in charge, not that he would blindly follow the foreman's orders even if sure that an accident would result. Indeed, Wall's answer may well be read as merely subscribing to Mr. Justice Moody's observation that "when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and coördination, or there will be chaos". Standard Oil Co. v. Anderson, 212 U.S. 215, 226, 29 S.Ct. 252, 256, 53 L.Ed. 480 (1909).

tinctions. These are the presence in that case of a payment by the stevedore to the general employer for the use of the winch, and the absence there of evidence of an employment relationship between the winchman and the stevedore, including the important element of compensation. Although payment to the general employer for the service rendered is good evidence that the employee was still doing the general employer's work, it is not the only possible means of proving that. Here there was other evidence. The judge thought it only common sense that the hoister was serving some business purpose of the Pennsylvania, and deemed himself warranted in drawing this inference in view of the Pennsylvania's failure to rebut it. In fact the record contained an exhibit marked for identification but, apparently through oversight, not actually introduced, which showed what that business purpose was. Since the Pennsylvania has referred to this exhibit, a contract signed by the Pennsylvania, the Lehigh Valley, and the six other railroads serving New York harbor, in its brief and reproduced it in its appendix, we see no reason why we should not consider it, as we could even without such reference if the case had been tried on the "admiralty side" of the court, as the judge at one place in the transcript said it was. See Admiralty Rule 45; Robillard v. A. L. Burbank & Co., Ltd., 186 F.Supp. 193, 194 (S.D. N.Y.1960). The contract recites that "it is the arrangement and practice at the Port of New York for the parties and the contract stevedores of the parties hereto to use hoisting lighters or derricks owned by any of the parties hereto in performing the work of loading or unloading cargo to or from deck scows, lighters or other vessels owned by or in the custody or possession of any of the parties hereto, when available and in the vicinity of the work," and that "the parties hereto are agreeable to such arrangement and practice, which is for the mutual benefit of the parties hereto, and is designed to further the efficient and expeditious handling of traffic at the Port of New York." It contains detailed clauses relating to indemnification and the handling of claims arising out of the hoisting services rendered. Although the contract makes no provision for payment for these services, it nevertheless shows that hoister #218 was indeed serving a business purpose of the Pennsylvania, as the judge surmised: the benefit received by the Pennsylvania for the #218's service in unloading the Lehigh Valley barge was the reciprocal service of Lehigh Valley hoisters in unloading Pennsylvania barges

The other point said to distinguish this case from Anderson—the employment relationship between Wall and Spencer—does not require a conclusion that Wall had ceased to be the Pennsylvania's servant when he was still doing the Pennsylvania's work and had by no means surrendered control over the Pennsylvania's valuable machine. See American Law Institute, Restatement of Agency 2d, sec. 227, comments a, b, c, illustration 4; sec. 220(1), comment c; Ware v. Cia de Navegacion Andes, S.A., 180 F.Supp. 939, 942–944 (E.D.Va.1960); Charles v. Barrett, 233 N.Y. 127, 135 N.E. 199 (1922). What it may well mean is that Wall had become Spencer's servant too. See American Law Institute, Restatement of Agency 2d, secs. 226, 227 comment d; 17 A.L.R. 2d 1408 (1951). But this is without consequence as to the Pennsylvania's liability to Williams.

### III. THE PENNSYLVANIA'S CLAIM OVER AGAINST SPENCER

Irrespective of Wall's employment status, it is clear that Spencer, whose foreman was in charge of the unloading and negligently gave the order that led to the injury, was more to blame than the Pennsylvania. That it should nevertheless succeed in fastening the entire loss upon the Pennsylvania, thereby escaping even the Compensation Act liability it would have borne as Williams' employer in the absence of any fault by either defendant, see 33 U.S.C. § 901

et seq., is a result not readily acceptable under "a legal system that has been so responsive to the practicalities of maritime commerce and so inventive in adapting its jurisdiction to the needs of that commerce". Swift & Co. v. Compania Columbiana del Caribe, S.A., 339 U.S. 684, 691, 70 S.Ct. 861, 94 L.Ed. 1206 (1950).

Any judgment over against Spencer on a theory of contribution seems out of the question. If the only problem were the Supreme Court's refusal, in Halcyon Lines v. Haenn S. C. & R. Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), to sanction a departure by the admiralty from the common law rule precluding contribution by joint tortfeasors in other than collision cases, the obstacle might be surmounted here. For the common law rule was subject to an exception when the liability of the two parties arose from tortious conduct of their joint servant, see American Law Institute, Restatement of Restitution, § 99; 1 Harper & James, Torts, § 10.2, at 716, and cases cited ibid. ns. 8, 11; and, as noted, Wall seems to have been the servant of both the Pennsylvania and Spencer. However, the difficulty is not simply the common law rule but § 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905, which makes the employer's compensation liability exclusive of any other right to recover damages against him "on account of" injury to his employee. Before Halcyon, we had held in American Mut. Liab. Ins. Co. v. Matthews, 182 F.2d 322 (2 Cir. 1950), that this was a valid defense to an asserted right of contribution; although Halcyon did not approve this holding, it likewise did not disapprove it, see also Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 132, n. 6, 76 S.Ct. 232, 100 L.Ed. 133 (1956), and the decision is in line with the weight of authority relating to compensation acts, see 2 Larson, Workmen's Compensation, § 76.21 and .22 (1961). Section 5 would also seem an insurmountable obstacle to a judgment over against Spencer on a theory

of what the judge called "common law indemnity", see Brown v. American-Hawaiian S.S. Co., 211 F.2d 16, 18 (3 Cir. 1954); cf. Slattery v. Marra Bros., Inc., 186 F.2d 134, 138–139 (2 Cir.), cert. denied, 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951), even if we should assume that this doctrine—of a liability imposed by law on a party guilty of "active" in favor of one guilty only of "passive" negligence, see Westchester Lighting Co. v. Westchester County Small Estates Corp., 278 N.Y. 175, 15 N.E.2d 567 (1938); McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 328, 107 N.E.2d 463, 471 (1952); Slattery v. Marra Bros., Inc., supra—is recognized in maritime law and that there was any reason to disagree with the judge's conclusion that the Pennsylvania was guilty of "active" negligence. On the other hand, neither the Compensation Act nor the Pennsylvania's "active" negligence nor the Halcyon decision would bar indemnity from Spencer on the contractual basis of breach of the stevedore's implied warranty to unload the barge in a workmanlike manner. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 132–135, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 569, 78 S.Ct. 438, 2 L.Ed. 2d 491 (1958); Calmar S.S. Corp. v. Nacirema Operating Co., 266 F.2d 79 (4 Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 56, 361 U.S. 816 (1959); 2 Larson, supra, § 76.41.

Recovery on this theory is not precluded by the fact that the Pennsylvania was not a party to the stevedoring contract between Spencer and the Lehigh. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); DeGioia v. United States Lines Co., 304 F.2d 421, 425–426 (2 Cir. 1962); Drago v. A/S Inger, 305 F.2d 139, 142 (2 Cir. 1962). But all these decisions extending the stevedore's warranty beyond two-party contractual relations have

done this for the benefit of the owner of the ship being unloaded; we have found no case allowing recovery on the warranty in favor of some other party which, like the Pennsylvania here, stands in a different relationship to the stevedore but has nevertheless been held liable for injuries resulting from the stevedore's breach of warranty.

The facts of this case justify taking this further step. See Brown v. American-Hawaiian S.S. Co., supra, 211 F.2d at 18 n. 4. Since the Lehigh Valley owed the Pennsylvania a duty of due care in the use of the hoister to unload the barge, and since Spencer by unloading the barge in compliance with its warranty of workmanlike service would be satisfying that duty of the Lehigh Valley, it seems reasonable to regard the Pennsylvania as a third-party beneficiary of the warranty. See Davis v. Dittmar, 6 F.2d 141 (2 Cir. 1925); American Law Institute, Restatement of Contracts, § 133(1) (b); cf. id., § 145(b), & illustration. Indeed, under the inter-railroad agreement the Lehigh Valley went beyond an undertaking to use due care and undertook to hold the Pennsylvania harmless against any claim arising from the unloading of a Lehigh Valley vessel; if the Pennsylvania had seasonably asserted its rights under that agreement[5] it would have been entitled to indemnity from the Lehigh Valley, and the Lehigh Valley could then have recovered from Spencer on the latter's contractual warranty to it, thus achieving in two steps the same result that the Pennsylvania here seeks to achieve in one. Cf. Paragon Oil Co. v. Republic Tankers, S.A., 310 F.2d 169, (2 Cir. 1962).[6] This

5. The agreement required the railroad against whom a claim was asserted to notify the indemnitor "in writing within a reasonable time after claim is made or litigation instituted (as the case may be) and tender control of the handling of the claim and/or the defense of the litigation" to the indemnitor. More than two years after answering the complaint and impleading Spencer, and less than two weeks before the action was scheduled to go to trial, the Pennsylvania sought permission to add the Lehigh Valley as a third-party defendant on the basis of this agreement. The motion was denied.

6. In Paragon we suggested that the libelant shipowner, who held a safe-berth warranty from the defendant charterer who in turn held an identical warranty from the impleaded consignee, could have recovered directly from the consignee on a theory akin to that of the Crumady and Waterman cases, supra. That suggestion is not inconsistent with our recent decision in Ferrigno v. Ocean Transport Ltd., 309 F.2d 445 (2 Cir. 1962), where the stevedoring contractor had agreed to hold the charterer's agent and the charterer harmless from any liability for death or injury sustained during the stevedoring operations, and we held that this covenant did not enable the shipowner to recover over against the contractor in the absence of any breach by the latter of its separate warranty of workmanlike service. As Judge Clark pointed out in Ferrigno, there was no evidence that the hold-harmless covenant by the stevedore to the charterer was mirrored by any similar provision in the contract between the charterer and the shipowner; on the contrary, that contract provided that "the charterers shall not be in any way responsible for the acts or defaults of the Stevedores." Hence the argument in favor of doing in one step what could admittedly be done in two was not available to the shipowner there, as it was to the charterer in Paragon and as it is to the Pennsylvania here. Moreover, the hold-harmless covenant involved in Ferrigno is significantly different, for purposes of third-party recovery, from the safe-berth clause at issue in Paragon and the stevedore's warranty of workmanlike service here. Since a hold-harmless clause is in terms a promise to indemnify a specific person, it cannot readily be construed as "intended to benefit" other persons and as obliging the promisor to pay them as well as the promisee; "to give the third party a judgment for his debt would often compel the surety to do more than he promised to do." 4 Corbin, Contracts, § 800, at 175; see id. at 174–175. Furthermore, the public policy consideration supporting imposition of liability in favor of a third party on a stevedore's warranty of workmanlike service or a consignee's warranty of a safe berth— the interest in allocating the loss to the party "most able to minimize the particular risk involved," DeGioia v. United States Lines Co., 304 F.2d 421,

case is unlike Isbrandtsen Co. v. Local 1291, ILA, 204 F.2d 495 (3 Cir. 1953), where it was held that a charterer of a ship delayed in unloading as a result of an unauthorized work stoppage by longshoremen could not recover damages from the longshoremen's union as third-party beneficiary of the union's collective bargaining contract with a marine trade association of which the stevedoring company retained to unload the ship by a sub-charterer was a member. Judge Goodrich there noted that "Isbrandtsen is * * * three steps away from the contracting party" and that "the labor union was a complete stranger to Isbrandtsen so far as this transaction is concerned," adding that "there is no authority known to us which [goes] * * to the extent of holding liable a promisor whose contemplation of a third party does not appear from the contract." 204 F.2d at 496, 497, 498, n. 13. Here, however, Spencer must have known, at the time it contracted to unload heavy cargo for the Lehigh Valley, that cranes would be needed, and it quite obviously expected to meet this need by making use of a hoister belonging to some railroad.[7] That the Pennsylvania, or some other railroad other than the Lehigh Valley, would thus probably be involved in the unloading operation; that this third party would stand to benefit from Spencer's performance of its warranty of workmanlike service, or suffer from its non-performance; and that—unlike the Isbrandtsen situation—the third party would be involved in a close working relationship with Spencer essential to Spencer's performance of its basic contractual duty—all these facts were clearly within Spencer's knowledge at the time of contracting. Cf. Ware v. Cia de Navegacion Andes, S.A., supra, 180 F. Supp. at 945 (ship held third-party beneficiary of implied warranty by pier operator furnishing crane to stevedore).

Beyond all this, we have held that a stevedore's warranty of workmanlike performance is not limited to persons who can bring themselves within the rules of third-party beneficiary law. In DeGioia v. United States Lines Co., 304 F.2d 421 (2 Cir. 1962), we rejected a stevedore's claim that it need not indemnify the shipowner because the latter was "neither a party to nor a third-party beneficiary of the agreement" between the stevedore and the United States Army. "This claim rests," we said in an opinion by Judge Clark, "on a misunderstanding of the nature of the stevedore's obligation. * * * [W]hile the cases speak in the language of contract, it is misleading to cling to the literal implications of that language. The scope of the stevedore's warranty of workmanlike performance is to be measured by the relationship which brings it into being. Since the shipowner here was held liable for injuries the jury found were the foreseeable result of the stevedores' failure to perform in a workmanlike fashion, it may recover indemnification, whether it was strictly a 'third-party beneficiary' or not." 304 F.2d at 425–426. Accordingly, since the Pennsylvania here was held liable for injuries that were the foreseeable result of the negligence of Spencer's foreman, and since, moreover, the involvement of the Pennsylvania or some other crane-owner in the unloading was within Spencer's contemplation at the time the warranty was made, the Pennsylvania was entitled to indemnification "whether it was strictly a 'third-party beneficiary' or not."

Alternatively, we think the Pennsylvania would be entitled to indemnification on the basis of an independent con-

426 (2 Cir. 1962)—is inapplicable, as Judge Clark pointed out in Ferrigno, to an absolute hold-harmless clause given by a stevedoring contractor which, by living up to its warranty of workmanlike service, has in fact minimized the risk resulting from its operations.

7. The preamble to the inter-railroad agreement referred to "the arrangement and practice at the Port of New York for the parties *and the contract stevedores of the parties*" to use hoisting lighters of the various railroads (italics added).

tract between Spencer and itself. When Spencer's foreman, Alexander, "hired" Wall to help unload the barge, both were acting within the scope of the authority granted by their respective employers. Despite the informality of the arrangement, see Booth S.S. Co. v. Meier & Oelhaf Co., 262 F.2d 310, 313 (2 Cir. 1958), it amounted to a contract between Spencer and the Pennsylvania—a contract involving a lease or bailment of the hoister as well as a loan of Wall's services in operating it. We see no reason why this contract should not be deemed to include an implied warranty by Spencer to exercise due care in the use of the hoister, see Baugh v. Rogers, 24 Cal.2d 200, 214, 148 P.2d 633, 641–642, 152 A.L.R. 1043 (1944); cf. Pan-American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co., 281 F. 97, 108 (2 Cir.); cert. denied, 259 U.S. 586, 42 S.Ct. 589, 66 L.Ed. 1076 (1922), or why Alexander's negligent signal would not constitute a breach of this warranty.

■■ Having found that the Pennsylvania had a contractual right to indemnity from Spencer, we must next consider whether its own conduct was such as to defeat or limit this right. Recovery by the Pennsylvania on a contract of indemnity is not precluded by the judge's permissible conclusion that Wall's compliance with Alexander's signal constituted "active negligence", which would bar "common law indemnity"; Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 569, 78 S.Ct. 438, 2 L.Ed. 491 (1958), is specific that this is not the test. On the other hand, as the Weyerhaeuser opinion also indicates, 355 U.S. at 567, 78 S.Ct. at 440, it would surely be wrong to suppose there can never be circumstances in which the breach of duty by the third-party plaintiff is so great as to preclude it from holding the stevedore on the latter's warranty of workmanlike service. Wherever the line defining such misconduct may lie, see Calmar S. S. Corp. v. Nacirema Operating Co., supra, the Pennsylvania did not cross it here. Spencer's fault was itself the cause of

the Pennsylvania's fault, which consisted in Wall's obeying Alexander's imprudent signal. The case is thus a distinctly stronger one for indemnity than others in which recovery over has been allowed, as when the stevedores "did no more than bring into play the unseaworthy condition of the vessel", Crumady v. The Joachim Hendrik Fisser, supra, 358 U.S. at 427, 79 S.Ct. at 447, 3 L.Ed.2d 413, or when the ship supplied a defective light which was then negligently handled by the stevedores, Calmar S. S. Corp. v. Nacirema Operating Co., supra. See also Ryan Stevedoring Co. v. Pan-American S. S. Corp., supra, 350 U.S. at 134–135, 76 S.Ct. at 237–238; Weyerhaeuser S. S. Co. v. Nacirema Operating Co., supra, 355 U.S. at 568, 78 S.Ct. at 441; Drago v. A/S Inger, supra, 305 F.2d at 142–143. Nor does this case compel us to decide whether fault insufficient to act as a total bar to recovery on the claim over may nevertheless suffice to justify a partial judgment for the stevedore on a counterclaim against the third-party plaintiff. See Pettus v. Grace Line, Inc., 305 F.2d 151, 156 (2 Cir. 1962) (Clark, J., dissenting); 2 Larson, Workmen's Compensation, at 233 (1961). We assume that the direct contract between Spencer and the Pennsylvania should be deemed to include not only an implied warranty by Spencer to exercise due care in its use of the hoister, but a reciprocal implied warranty by the Pennsylvania to supply a sound and adequate piece of equipment, see Mowbray v. Merryweather, [1895] 2 Q.B. 640, 642 (C.A.); American Law Institute, Restatement of Restitution, § 93, and a careful operator as well. Ware v. Cia de Navegacion Andes, S.A., supra, 180 F.Supp. at 945. Granting that such a warranty was made by the Pennsylvania, there is no evidence of breach. Nothing suggests that Wall was not a qualified operator; he had been running the hoister for nearly three years before the accident, to the apparent satisfaction not only of the Pennsylvania but of Spencer as well. Negligent vis-a-vis Williams on this occasion he turned out

to be, but it would be wholly unreasonable to suppose that the Pennsylvania warranted an operator who would refuse to execute orders from Spencer entailing risks quite as apparent to Spencer as to him. The Supreme Court has told us that "Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman * * *, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense", Ryan Stevedoring Co. v. Pan-American S. S. Corp., supra, 350 U.S. at 134–135, 76 S.Ct. at 237–238; the same must be true as to the use of such a failure as a counterclaim.

■ Although the Pennsylvania would thus be entitled to indemnity from Spencer on the evidence and the law, there remains a question whether judgment over can be directed on the record as it now stands, in view of the Pennsylvania's reliance at the trial on a theory of recovery differing from the one here found valid.

The first count of the third-party complaint was founded on a general stevedoring contract between the Pennsylvania and Spencer, made in 1944, with a clause wherein Spencer agreed to indemnify the Pennsylvania against any claims for personal injuries incident to the stevedoring work and not arising solely from the railroad's negligence. The second count was a general claim that if Williams had suffered injury, this was brought about by his own negligence "and/or the primary, active, or affirmative negligence" of Spencer, and that "by reason of the premises" the latter "is bound to indemnify the Railroad for any sum that the plaintiff may recover against the Railroad." The first count was included because Williams' complaint had alleged that the barge that was being unloaded was owned by the Pennsylvania. When it appeared at the trial that barge #114 was owned by the Lehigh Valley, counsel for the Pennsylvania conceded that the 1944 contract was irrelevant and afforded no basis for recovery over. Upon the judge's inquiring what the asserted basis was, counsel for the railroad stated at one point that its third-party claim was "of common law indemnification" and at another that it was based "on implied or common law indemnification", apparently without perceiving that the two latter concepts were different and might lead to differing results.

Although the second count of the third-party complaint threw no light on the specific grounds asserted by the Pennsylvania for recovery over, it was broad enough to include the theories of contractual indemnity we find sustainable as well as the "common law indemnity" we find not to be. Considering the entire record, we see no basis for concluding that the Pennsylvania abandoned any theory entitling it to indemnity, other than that based on the 1944 contract. But the statements of its counsel were sufficiently ambiguous that Spencer might have been lulled into the belief that the only theory asserted was one of "common law indemnity," a view which quite clearly was entertained by the trial judge. While we do not now perceive what defenses Spencer has to the Pennsylvania's claim for indemnity on an implied warranty arising out of the stevedoring contract with the Lehigh Valley—the text of which, however, is not before us—or the hiring of the hoister from the Pennsylvania, we would think it improper to foreclose the issue under these circumstances. Accordingly, instead of directing a judgment for the Pennsylvania on the third-party claim, we shall vacate the judgment dismissing the claim and remand the case to the district court with instructions to permit Spencer to present evidence tending to negate liability as an indemnitor under the theories of implied warranty here approved if Spencer be so advised, and if such evidence is not forthcoming within a reasonable time or is not adequate, to enter judgment for the Pennsylvania against Spencer for the amount.

in which it has been held liable to Williams plus attorneys' fees and disbursements in defending against Williams' claim. See Hormel v. Helvering, 312 U.S. 552, 560, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); Freitag v. The Strand of Atlantic City, 205 F.2d 778, 781–782 (3 Cir. 1953); cf. Massachusetts Bonding & Ins. Co. v. State of New York, 259 F.2d 33, 40 (2 Cir. 1958).

The judgment in favor of Williams against the Pennsylvania is affirmed, with costs on appeal; the judgment dismissing the Pennsylvania's claim against Spencer is vacated, with costs, and the case remanded for further proceedings consistent with this opinion.