**DORSID TRADING COMPANY**

v.

**S/S FLETERO, Her Engines, Boilers, Tackle, etc., et al.**

**Civ. A. No. 69–H–963.**

United States District Court,
S. D. Texas,
Houston Division.

April 11, 1972.

Michael S. Wilk, Hirsch, Westheimer & Block, Houston, Tex., for plaintiff.

Robert C. Davee, Eastham, Watson, Dale & Forney, Houston, Tex., for defendant ELMA.

Theodore Goller, Fulbright, Crooker & Jaworski, Houston, Tex., for defendant Strachan Shipping Co.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

The plaintiff, Dorsid Trading Company, brought this suit against the S/S FLETERO, its owners, operators and charterers, and Strachan Shipping Company, the discharging stevedore, to recover the sum of $14,845.27 as alleged damages caused by rust and improper handling to a shipment of oil well tubing and casing. The cargo was carried on board the vessel from Buenos Aires, Argentina, to Houston, Texas, under Bills of Lading Nos. 6 through 17 inclusive, and discharged in Houston during the period May 17 through May 21, 1968.

The plaintiff (Dorsid) is a Texas corporation, which at all times material hereto and for several years previously has been engaged in business as an importer of steel products from Argentina and other nations for distribution and sale to the wholesalers of steel products in the Houston area. Defendant Empresa Lineas Maritimas Argentinas (ELMA) is a foreign corporation which was the owner and operator of the S/S FLETERO and the carrier under the bills of lading. Defendant Strachan Shipping Company (Strachan) is an independent stevedoring contractor which was employed by ELMA to discharge cargo from the S/S FLETERO including the cargo made the subject matter of this suit on or about May 17, 1968.

On or about April 14, 1968, the shipper, Dalmine Siderca, an Argentine company engaged in business in Argentina as an exporter of steel products, delivered to the carrier ELMA at Buenos Aires a cargo consisting of 9,642 pieces of oil well tubing and casing for carriage to Houston aboard the FLETERO. ELMA was a carrier of that shipment within the meaning of the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., and the ocean carriage involved in this action is subject to that Act.

The FLETERO arrived at the Port of Houston on or about May 17, 1968. The pipe consigned to Dorsid was discharged by Strachan directly from the vessel into open rail cars and motor trucks engaged by Dorsid for carriage to the premises of Consolidated Bonded Warehouses in Houston, pursuant to instructions received from Dorsid. Both Dorsid and Consolidated Bonded Warehouses are corporations in which the stock is wholly owned or controlled by Mr. Sidney Slavin, the president of both companies, and his wife.

Each bill of lading, numbers 6 through 17, under which this shipment of pipe was carried contained on its face the following typed clause:

Material is acknowledged as being loaded into vessel with couplings all facing forward and shall be discharged in the same manner.

Dorsid's claim for bending and handling damages to the pipe and for rust damage, an aggregate amount exceeding $14,000, was paid by its cargo underwriters in return for a full assignment of Dorsid's interests in such claim. The cargo underwriters in turn negotiated a full settlement for $2,500 and released ELMA. Dorsid now contends that it re-

tained for its own account a separate claim in the sum of $689.85 representing its costs of turning 404 pieces of oil well casing so that all of the couplings faced in the same direction, pursuant to the above clause in the ocean bills of lading.

In accordance with the requirement of COGSA, 46 U.S.C. § 1303(6), Dorsid notified ELMA through its agent Strachan on May 20, 1968, within three days of delivery, of claims "for any and all damages and/or shortages on the above shipment," referring to bills of lading Nos. 6 through 17. *See* plaintiff's Exhibit 11. It is now contended by the carrier that, while this letter was notice for bending and rust damages and shortages to the pipe itself, it was not proper notice for any claim of damages for mishandling or turned couplings.

In addition to the question of proper notice, there are great discrepancies in the evidence as to what amount of "turned" or mishandled pipe actually existed, as to where and at what point in time the alleged turning occurred, and as to what amount, if any, of actual damage was sustained by reason of the alleged mishandling.

## I.

■ We turn first to the question of *proper notice.* If the Court accepts defendant ELMA's theory that the letter of May 20 was not notice as to mishandling or turning, section 1303(6) of COGSA creates a prima facie case that the cargo was delivered by the carrier in the condition described in the bills of lading, Otis McAllister Export Co. v. Grancolumbiana (New York), Inc., 216 F.Supp. 756, 757 (E.D.La.1963). *See also,* W. Poor, Charter Parties and Ocean Bills of Lading § 64 at 164 (5th ed. 1968). From the proof forthcoming at the trial, this Court is convinced that the notice letter sent by the plaintiff was sufficiently broad so as to encompass a claim for mishandling or turning damage, and the Court therefore finds that the notice requirements of section 1303(6) were met. However, even though this Court finds that sufficient

notice was given, plaintiff must still satisfy his burden by demonstrating not only that cargo was received by the carrier in good condition, but also that such cargo arrived at its destination in a damaged state. Interstate Steel Corp. v. S/S "CRYSTAL GEM", 317 F.Supp. 112, 118, 1970 A.M.C. 617 (S.D.N.Y. 1970).

■ Insofar as proof of damage is concerned, the Court notes that defendant ELMA had no opportunity to sight the pipe before it was unloaded by plaintiff's crews at the yard of Consolidated Bonded Warehouses, although delivery was actually complete when the pipe was loaded into rail cars and trucks from the ship's tackle. Calcot, Ltd. v. Isbrandtsen Co., 318 F.2d 669 (1st Cir. 1963), 1963 A.M.C. 1993. The failure of the plaintiff to prove damage at the time of delivery is especially critical in a case such as this one in which the alleged "damage", or "turning" manifests itself as a result of actions entirely unrelated to the initial alleged mishandling.

There is testimony to the effect that two surveys were made of the shipment of pipe in order to assess the extent of damage (testimony of Sidney Slavin; defendant ELMA Exhibit 3). Mr. Slavin testified that Captain R. L. Wynne conducted a survey on or about June 19, 1968, but Mr. Slavin had no recollection of Captain Wynne's findings. Captain George J. Salter, an independent marine ship and cargo surveyor, was employed by ELMA to determine the cause and extent of alleged damage to the shipment of pipe in question. On June 27, 1968, he conducted a survey on the premises of Consolidated Bonded Warehouses accompanied by Mr. Slavin. He reported minimal handling damage (physical damage) to 177 pieces of tubing and estimated that the cost of repairs to return the pipe to a serviceable condition would be between $700 and $800. No mention of mishandling or turning was made to Captain Salter; and no findings were made by the Surveyor in this regard. In fact, his testimony was to the effect that he had nev-

er handled a claim for mishandling or turning, nor could he recall any consignee other than Dorsid making such claim.

The delivery receipts executed upon transfer of the pipe from the vessel to rail cars and trucks reflect that a total of 115 pieces were stowed in the ship with the coupling ends reversed, despite the notation to the contrary in the typed claused, quoted *supra,* in the bills of lading. However, the receipts do not reflect whether these pipes were turned by Strachan during the discharge operations so that all pipes were unloaded into rail cars and trucks with all couplings facing forward.

Other documentary evidence present further inconsistencies. For example, the receiving reports issued by Consolidated Bonded Warehouses upon delivery from rail and truck carriers, reflect that only 76 pieces of pipe had coupling ends turned in the *wrong direction.* However, the report further reflects that all 76 pieces were transported in the same rail car, leading to the conclusion that the car itself had been turned at some point between the vessel and the warehouse. *See* defendant Strachan's Exhibit 1, Receiving Report No. 2102.

A third document, prepared by Mr. Allen Westheimer, former employee of Dorsid, purports to be a summary damage report in regard to the bills of lading at issue here. This report is in no way consistent with either the delivery receipts or the receiving reports noted, *supra.* A total of 404 pieces from bills of lading nos. 8, 9, 13 and 14 are listed therein as having coupling ends reversed. After a considered review and comparison of these records, this Court finds this particular document to possess little, if any, probative value. The document was not a record kept in the normal course of business, and the written or verbal information from which it was prepared is not ascertainable and therefore cannot be substantiated. *See* the testimony of Mr. Westheimer and plaintiff's exhibit No. 15.

Assuming that sufficient notice of the mishandling claim was given to defendants by Dorsid so as to forestall a *prima facie* case arising against the plaintiff, this Court finds that Dorsid has failed to meet its burden of showing that any pipes were delivered from the vessel with the coupling ends "turned the wrong way", Interstate Steel Corp. v. S. S. "CRYSTAL GEM", 317 F.Supp. 112, 122, 1970 A.M.C. 617 (S.D.N.Y.1970). In short, the plaintiff has entirely failed to prove that any pipes were discharged from the vessel in "damaged" or "turned" condition. Miami Structural Iron Corp. v. Cie Nationale Belge De T. M., 224 F.2d 566, 568 (5th Cir. 1955).

## II.

Another aspect of plaintiff's case is also found to be wanting upon close scrutiny of the evidence. There is convincing proof that any increased expense incurred in the turning of, at most, 115 pieces of pipe out of a total shipment of over 9,000 during routine discharge, would have been nominal. Mr. Rex Cooper, a self-employed transporter and warehouseman dealing in oil field casing and tubing, testified that if ten percent or less of the couplings in a rail car were turned, that car would not be considered a "mixed" car and there would be only a slight additional charge, if any, for handling such a load. If 25 percent of the pipe in one car were turned, the shipment would be considered to be "mixed", and charges would be roughly doubled on the weight contained in that car. However, if the entire contents of a certain car were loaded in the reverse direction from other carloads, no problems would arise in normal unloading operations, and no extra charge would be incurred. The car would simply be turned around. Thus, a normal charge of $3.50 per ton might be increased to $7.50 per ton for handling "mixed" pipe. *See also* the testimony of Captain Salter. By contrast, Mr. Slavin testified that he assessed an additional charge of $5.00 per ton to turn the pipe during discharge, regardless of the per-

centage of pipes which were reversed in the rail car.

The Carriage of Goods By Sea Act, 46 U.S.C. § 1304(5), and the bills of lading issued provide that in no event shall the carrier be liable for more than the amount of damage actually sustained. Assuming, *arguendo*, that some of the pipe consigned to Dorsid was delivered with couplings facing the wrong way, Dorsid must still meet its burden of proving actual damages, Interstate Steel Co. v. S/S "CRYSTAL GEM", 317 F. Supp. 112, 1970 A.M.C. 617 (S.D.N.Y. 1970).

Both Dorsid and Consolidated are corporations owned and controlled by the same individuals. The two entities share premises, offices and, to some extent, employees. Charges from one to the other are normally merely bookkeeping entries, and actual billing and paying do not occur. While this Court does not question that Dorsid and Consolidated are, in reality, two separate corporations, *see, e. g.,* Houston Oil Field Material Co., Inc. v. Stuard, 406 F.2d 1052, 1054 n. 1 (5th Cir. 1969), yet on the basis of the record in this suit the Court does find that the transaction in question between Consolidated and Dorsid was certainly less than one negotiated at arm's length. It is thus the opinion of this Court, and it so finds, that the invoiced amount for increased handling charges, $689.85, is not an accurate or definitive representation of actual damages.

Analogous cases have held that the measure of actual damages is the reasonable and necessary cost of repairing or reconditioning the damaged cargo where such costs are less than the diminution in market value sustained and do not exceed the value of the cargo prior to injury, Interstate Steel Co. v. S/S "CRYSTAL GEM", 317 F.Supp. 112, 1970 A.M.C. 617, 627 (S.D.N.Y.1970), and cases cited therein. In determining the extent of such costs, expert testimony and marine survey reports are accepted, even where the actual costs of such reconditioning have not been prov-

en. *Id.* Here, neither Dorsid nor Consolidated has any records showing the actual time or expense of turning the pipe, if, indeed, any was required. Nor is there any reason to believe, accepting any version of the facts, that the cost in time and labor was anything but miniscule. Additionally, the testimony of Captain Salter and Mr. Rex Cooper, both qualified as experts in this cause, is convincing proof that neither (1) turning 115 pipes from a total of over 9,000, nor (2) turning the entire contents of one rail car would result in actual damages to the plaintiff.

Thus, this Court finds that plaintiff has failed to prove either that cargo was discharged in a "damaged" condition or that, if such "damage" did occur, the plaintiff sustained additional costs over those of routine discharge in any but the most nominal amount. Accordingly, the plaintiff is found to be entitled to no monetary recovery based on the evidence in this case.

### III.

In view of this Court's findings, the remaining question in this suit is non-determinative. However, the significance of the legal issues presented warrants examination.

The applicable bills of lading contain[7] a provision, clause 2, that they shall have effect subject to the provisions of COGSA, which is thereby incorporated into each bill of lading. Clause 4 of the bill provides in pertinent part:

(a) Because of the relationship between them and as the carrier requires persons and companies to perform or assist it in performance of work or services undertaken by it in this contract, *it is expressly agreed between the parties hereto that the . . . stevedores* [and certain others] *. . . used, engaged or employed by the carrier in the performance of such work or services, shall each be the beneficiaries of and shall be entitled to the same, but no further exemptions and immunities from and limitations of liability which the car-*

*rier has* under this bill of lading. . . . . (emphasis added)

(b) Without limitation or restriction of the exemptions and immunities from and limitations of liability provided for in *subdivision (a), the persons and companies mentioned therein shall be entitled to the same . . . benefits which the carrier has under Clauses 25 and 29* of this bill of lading. (emphasis added).

The bill of lading provides in Clause 29, as follows:

. . . in any event, *the carrier and the ship shall be discharged from all liability* for any loss or damage to the goods . . . or any claim whatsoever kind, nature or description, with respect to or in connection with the goods *unless suit . . . is brought within one year* after delivery of the goods or the date when the goods should have been delivered. (emphasis added)

Defendant Strachan argues that these provisions require application of the COGSA one year statute of limitations to claims against the stevedore by cargo or its assignee. Specifically, it is asserted that, even though the carrier, ELMA, granted an extension of time in which to sue, that extension, absent an independent extension on the part of Strachan, does not operate to extend the time for suit by cargo directly against the stevedore.

The goods made the basis of this suit were delivered by the ocean carrier to Dorsid not later than May 21, 1968. Suit against the two defendants was not instituted until October 3, 1969, more than one year after delivery, but within the time covered by the separate extensions of time granted by ELMA. Strachan also granted one written extension to Dorsid, but that extension expired on July 17, 1969, some months prior to the filing of suit against ELMA and Strachan. Although the existing authorities do not supply a precise case in point to dispose of the novel question at hand, their reasoning dictates how the result is to be reached.

This Court's inquiry commences with the recognition of certain basic legal principles. It is a settled rule that parties to a bill of lading may extend a contractual benefit to a third party by clearly expressing their intent to do so. Robert C. Herd & Co., Inc. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820, 1959 A.M.C. 879 (1959); Secrest Machine Corp. v. S. S. Tiber, 450 F.2d 285, 286 (5th Cir. 1971); Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc., 275 F.Supp. 76, 78 (S.D.N.Y.), aff'd, 386 F.2d 839 (2d Cir. 1967), cert. den., 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968). It is equally clear that language of the import of that utilized in the governing bills in the instant case unqualifiedly expresses such an intent. *See* the comparable language in *Secrest* and *Montanari, supra.*

The critical question in the instant case is this: when such a benefit (the one year limitation period) has been bestowed on a third party (the stevedore) by the contracting parties, (shipper and carrier) can such benefit thereafter be waived, withdrawn or rescinded unilaterally by the carrier without the agreement of the third-party beneficiary?

The rights and privileges accruing to a third-party beneficiary are dependent upon the legal classification which such beneficiary occupies—that is, whether he is a donee, creditor or merely incidental beneficiary. Such classification must take into account not only general contract principles, but further give consideration to the actual business relationships involved; that is, the interplay of economic and policy considerations among the principals in the conduct of business involving the maritime transportation and delivery of cargo. After due consideration, this Court finds the intent of the parties and the character of their relationship to be clearly indicative of the creation of a creditor-beneficiary status for the stevedore. Indeed,

the express language contained in the applicable bills of lading, particularly Clause 4(a), points to this character of relationship occupied by Strachan vis-a-vis the contracting parties.

The legal authorities supporting the conclusion that the stevedore is a creditor-beneficiary in this case include fact situations involving implied relationships as well as written agreements. The business relationships between the stevedore and such others as the shipowner or charterer and the cargo interests have been held in numerous instances to create an implied third-party beneficiary status. This result has been reached both in the absence of specified contractual obligations and as an extension of existing contractual provisions.

In the early case of Davis v. Dittmar, 6 F.2d 141 (2d Cir. 1925) Davis contracted with Dittmar for the transportation of coal, Dittmar warranting to Davis that "all bottoms" would be seaworthy. Dittmar then, by oral charter with McClellan Transportation Co., chartered the EDMONT, obtaining a covenant that such vessel was seaworthy. The vessel was not, and it sank while carrying a load of coal, as a result of several disastrous leaks. At the time of suit Dittmar had been discharged in bankruptcy, and Davis as a third-party beneficiary of the verbal charter agreement secured a judgment against McClellan:

> After Dittmar gave the covenant for a seaworthy barge, he obtained a like covenant from the appellant. This latter agreement may be considered as security for Dittmar's obligation to the appellee Davis; that is, for the execution of Dittmar's covenant to the appellee Davis.

*Id.* at 142.

More recently, implied beneficiary status has been recognized in the stevedore cases involving the *Ryan* doctrine, Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The Supreme Court held the vessel to be a third-party beneficiary to the contract between

stevedore and charterer in Crumady v. Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959), stating that the warranty of workmanlike service owed by the stevedore to the charterer was "plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not." *See also* Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), which held the vessel owner to be a third-party beneficiary of stevedore's warranty to consignee of cargo, and Williams v. Pennsylvania R. R. Co., 313 F.2d 203 (2d Cir. 1963). *Williams* actually took *Crumady* and *Waterman* a step further. Whereas preceding cases had extended the stevedore's warranty beyond two-party contractual relations for the benefit of the shipowner, *Williams* found a similar third-party beneficiary relationship extending to other parties within the shipping context. There, the stevedore (Spencer) owed a warranty of workmanlike service to the barge owner (LeHigh Valley), who in turn owed a duty of due care to the Pennsylvania (owner of the hoister used to unload the barge). The Court found Pennsylvania to be a third-party beneficiary of the stevedore's warranty, citing as authority the *Dittmar* case and the creditor-beneficiary provision of the Restatement of Contracts § 133(1) (b):

> Since the LeHigh Valley owed the Pennsylvania a duty of due care in the use of the hoister to unload the barge, and since Spencer by unloading the barge in compliance with its warranty of workmanlike service would be satisfying *that duty of the LeHigh Valley,* it seems reasonable to regard the Pennsylvania as a third-party beneficiary of the warranty. (emphasis added)

313 F.2d at 211.

Thus, it is apparent that this basic working relationship of parties in the maritime industry has resulted in an implied third-party beneficiary status of such a nature that the beneficiary has been entitled to sue upon the "contrac-

tual" warranties. Benefits have been extended in this manner outside of the contractual agreement, from shipowner to cargo (*Dittmar*), from stevedore to shipowner (*Crumady, Waterman*), and from stevedore to other parties (*Williams*).

However, the working relationship alone is no longer enough to accord meaningful legal status to the third-party beneficiary when presented in the context of COGSA liability under the bill of lading. Whereas earlier reported cases had extended such beneficiary status merely by virtue of the fact that the agency was a means by which the carrier performed its contract of transportation and delivery, A. M. Collins & Co. v. Panama R. Co., 197 F.2d 893, 1952 A.M.C. 2054 (5th Cir. 1952), cert. den., 344 U.S. 875 (1954); United States v. The South Star, 115 F.Supp. 102, 1953 A.M.C. 1304, 1310–1311 (S.D.N.Y.1953), aff'd, 210 F.2d 44 (2d Cir. 1954), the view was overruled by the Supreme Court in Robert C. Herd Inc. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820, 1959 A.M.C. 879 (1959). In stressing the importance of the expressed intent of the parties, the Court stated at 305, 79 S.Ct. at 771,

> contracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they "are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties".

Although *Collins* and the *South Star* were overturned by *Herd*, it was not over any disagreement with the two lower courts' exposition of the shipowner's business relationship with the stevedore and others and the extension in such instances of an implied third-party beneficiary status; the decision was reached because there was no specific evidence of an intent by the contracting parties that a third-party beneficiary status

arise. As the Court in *Herd* pointed out:

> From its early history this Court has consistently held that an agent is liable for all damages caused by his negligence, unless exonerated therefrom, in whole or in part, by a statute or a valid contract binding on the person damaged.
>
> .    .    .    .    .    .
>
> [Here, no] statute has limited its liability, and it was not a party to nor a beneficiary of the contract of carriage between the shipper and the carrier, and hence its liability was not limited by that contract.

359 U.S. at 303 and 308, 79 S.Ct. at 770 and 773. *See also* Ferrigno v. Ocean Transport, Ltd., 309 F.2d 445 (2d Cir. 1962).

There definitely emerges from the cases, then, a basis-in-fact for the consideration of the stevedore as a third-party beneficiary, with the right to sue upon a contract which specifically confers benefits on such beneficiary. Accordingly, the remaining question must be: does the bill of lading in this case clearly include the stevedore as such a beneficiary?

> The question whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish.

17 Am.Jur.2d Contracts § 304 at 728. It is further held that:

> [t]he right of a third-party beneficiary to sue upon a contract depends as a rule, upon whether the contract is for his direct benefit. .    .    . [B]efore he can avail himself of the exceptional privilege of suing for a breach of agreement to which he is not a party, he must at least show that it was intended for his direct benefit.

*Id.* § 305 at 730–31. However, it is not necessary under the general rule "that a contract be exclusively for the benefit of a third person in order to give him a right of action thereon." *Id.* § 306 at 732.

The terms of the applicable bills, quoted *supra,* could not be more explicit in their requirements that, "because of the relationship, . . . stevedores [and others] . . . shall *each* be the beneficiaries of . . . the *same* . . . exemptions" given to the carrier under the bill, *see* Clause 4 (emphasis added).

A second, equally significant indicator of the intent of the parties is the action of the cargo claimant in this suit. When Dorsid sought extensions of time within which to bring suit, such extensions were requested from the shipowner and from the stevedore, each initially agreeing to grant extensions. It is apparent that Dorsid considered the power to grant such a request that would bind Strachan to lie only with Strachan, and it is equally clear that Strachan believed the same to be true. There is simply no indication in the record to the contrary; ELMA's extensions cannot be viewed as purporting to be binding upon Strachan.

The fact that the carrier, ELMA, has chosen to waive one of the benefits accruing under the bills of lading and COGSA should not mean that Strachan is concurrently stripped of that same benefit without any voice in the matter. Although the extension of "exemptions and immunities from and limitations of liability" to the stevedore is dependent upon the carrier's right to such benefits, the decision whether to exercise or to waive any specific benefit is not so dependent. Since the stevedore has been accorded the same exemptions as the carrier under the bill of lading by having been expressly made a third-party beneficiary, it has the right to waive or not waive any such benefit accruing to it thereby.

Dorsid further asserts that the *Secrest* case, cited *supra,* is inapposite in that the clause construed in that case provided that all defenses available to the carrier shall be available to the carrier's agents and servants "whether sued in contract or in tort." 450 F.2d at 286. Dorsid states that, since the governing bills of lading in the instant case do not contain any reference to the word tort, the one year statute is not applicable to Strachan in this suit. The Court is aware of and has considered these semantic distinctions. However, the provision of Clause 29 of the bills of lading that the one year statute shall be applicable to "any claim whatsoever kind, nature or description . . . .," is broad enough to bring this claim against Strachan within its frame of reference.

For the reasons heretofore set out in this Memorandum, plaintiff's claim against ELMA and Strachan must fail. This Memorandum constitutes the Findings of Fact and Conclusions of Law of this Court. Counsel will submit, within twenty (20) days, a proposed Final Order, costs of suit to be borne by Dorsid.