Giuseppe **NICROLI**, Plaintiff,

v.

**DEN NORSKE AFRIKA–OG AUSTRA-LIELINIE WILHELMSENS DAMP-SKIBS–AKTIESELSKAB, A/S** Tonsberg, **A/S Tankfart I, A/S Tankfart IV, A/S Tankfart V and A/S Tankfart VI,** Defendants and Third-Party Plaintiffs,

v.

**INTERNATIONAL TERMINAL OPER-ATING CO., Inc.,** Third-Party Defendant.

United States District Court
S. D. New York.
Aug. 31, 1962.

Di Costanzo & Klonsky & Sergi, Brooklyn, for plaintiff.

Haight, Gardner, Poor & Havens, New York City, for defendants and third-party plaintiffs; J. Ward O'Neill, Milton E. Bernhard, Thomas F. Molanphy, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for third-party defendant; Sidney A. Schwartz, New York City, of counsel.

McGOHEY, District Judge.

Giuseppe Nicroli, a longshoreman, suffered personal injuries while working aboard the M/S Troubadour on August 14, 1956. He seeks damages from the shipowner, alleging unseaworthiness and negligence.

The shipowner, if held liable, seeks indemnification from the stevedoring company (Stevedore), the plaintiff's employer, on the ground that the accident was the result of the latter's breach of its warranty of workmanlike service.

The Stevedore, in turn, if held liable to the shipowner, seeks indemnification from the plaintiff, its employee, on the ground that the only basis on which the Stevedore can be held liable is the plaintiff's own negligence or his failure properly to perform the work he was employed to do.

The parties having waived a jury, the issues were tried to the court, whose findings and conclusions appear in the opinion. The court has jurisdiction of the parties and subject matter of the claims asserted in the suit.

During all material times on August 13 and 14, 1956, the M/S Troubadour was owned by the defendant, a Norwegian corporation, and was moored starboard side to the National Sugar Refinery pier in Long Island City for the discharge of a cargo of bagged raw Philippine sugar by employees of International Terminal Operating Co., Inc., the Stevedore and third party defendant herein, pursuant to a contract between the latter and National Sugar Refinery, the consignee of the cargo.

On August 13 the gang of which Nicroli was a member worked at the No. 1 hatch.

The cargo was discharged in drafts by a split fall operation. Each draft contained fourteen 140-pound bags encircled by a rope sling attached to the up and down cable. As drafts were made ready in the hold they were raised by the up and down boom and, on clearing the hatch coaming, were pulled over by a gangwayman and brought to rest on a skid which extended from the hatch coaming to the ship's rail. A Burton boom, spotted over the pier, then dragged the draft along the skid until it cleared the rail and deposited it on the dock.

The skid was installed by the Stevedore. It consisted of six double boards, each one foot wide, bolted to and held together by three cross pieces. There were spaces between the boards. The skid was sixteen feet long and about six feet wide, supported at its offshore end about six inches or less from the hatch coaming by a wooden horse. Its other end rested somewhat higher on the ship's rail.

During unloading operations, some bags broke or were ripped, causing seepage of sugar. This was usual and expected. From time to time a gangwayman swept spilled sugar from the skid to the deck.

At the time of the accident, Nicroli was sixty-three years old and had been

a longshoreman for more than thirty years. He had had extensive experience in unloading bagged sugar. He was working as a cooper whose function was to salvage as much spilled sugar as possible in order to reduce cargo claims. It was his job to sew ripped bags and, with the other longshoremen in his gang, to gather spilled sugar into bags. For this purpose the Stevedore supplied each gang with twine, needles and bags, in addition to two T-shaped brooms and six shovels, of which the cooper was the custodian.

Brooms and shovels alone are not sufficient to clean all of the spilled sugar from the deck. A thin residue of sugar always and necessarily remains, and this can be removed only by hosing down the deck, an operation which is never performed by longshoremen but by the ship's crew, if anyone, and by them customarily only when the ship is out of port.

On August 13, Nicroli worked in the lower hold from 8:00 A.M. until 4:30 P.M. He then ascended to the main deck and, by sweeping and shoveling until 5:00 P.M., in the area of the No. 1 hatch, he gathered up about a half bag of sugar. Although he did his work with reasonable care and efficiency with the tools he had, a thin residue of sugar remained on the skid and on the deck in the vicinity of the skid. Philippine sugar when wet becomes like molasses. This is well known in the trade and was well known to Nicroli, and to the Stevedore's supervisors.

Before leaving work at 5:00 P.M., Nicroli stored the six shovels and two brooms, covered by a tarpaulin, at the forward side of the skid which was allowed to remain in place overnight, since the discharge of cargo from No. 1 hatch had not been completed.

Rain fell during the late afternoon and evening of August 13. A total rainfall of .81 inches was recorded at La Guardia Airfield, a few miles from the Long Island City pier where the M/S Troubadour was moored.

There were employees of the Stevedore aboard the vessel until 9:00 P.M. on the 13th, when the last gang quit work at No. 4 hatch, but no such employees were aboard from then until 7:00 A.M. on August 14, when rigging crews came on to prepare the hatches for that day's work. During the intervening ten hours the entire vessel was in the control of the shipowner. Neither the skid nor the deck in its vicinity was hosed down between 5:00 P.M. on the 13th and 8:00 A.M. on the 14th, when Nicroli came aboard. By that time the rain which had fallen during the night caused the residue of sugar on the deck in this vicinity to melt and become like molasses. This was obvious to both the ship's personnel and to the longshoremen. Neither group, however, took steps to correct this condition although there was ample time to do so by hosing the deck or by covering over the melted sugar with sawdust. It was foreseeable to the experienced men in each group that a man working in that vicinity might lose his footing on the melted sugar if it was left as it was.

On August 14, Nicroli's gang was assigned to discharge cargo from the No. 3 hold, and it was there that he reported when he came aboard at 8:00 A.M. No rain fell that day. He was directed by his hatch boss to get the shovels and brooms he had left overnight at the No. 1 hatch, which was then idle. Discharge of No. 1 hatch was not resumed on August 14 until 11:30 A.M. and then by another gang.

Nicroli proceeded to the forward end of No. 1 hatch along the offshore passageway, then across the deck to the forward side of the skid. The offshore area of the deck and the area forward of the No. 1 hatch were free of sugar. He picked up the six brooms and two shovels and held them on his left shoulder. He did not return to the No. 3 hatch along the offshore passage. Instead, he got up on the skid at a point where it was about two feet above the deck, near the hatch coaming, and walked aft across the skid. As his right foot came

down onto the deck it slipped on the melted sugar and he fell to the deck. His right elbow struck the after edge of the skid.

Quvus, a gangwayman, helped him to his feet. Some of the molasses-like melted sugar which was on the deck in this area was on Nicroli's pants when he arose.

Nicroli went ashore, where he reported the accident briefly to the Stevedore's timekeeper and bathed his elbow in hot water. This was about 9:00 A.M. He returned to the No. 3 hatch and worked in the hold there for the remainder of the day. He did not work again until April 1957, after which he worked until the end of the year at his regular occupation of cooper. In January 1958, having become sixty-five years of age, he retired.

Nicroli's earnings for the years 1952 through 1955 averaged $4,807.18. It is reasonable to assume that if he had not been injured his average earnings in 1956 and 1957 would have been about the same as the four-year pre-accident average. However, in 1956, the year of his accident, he earned only $2,688.85, and in the next year, the last of his employment, he earned only $2,456.87. Thus his lost earnings subsequent to the accident amount to $4,468.64. His compensation payments amounted to $1,475.14. His medical expenses amounted to $368.15. The latter were paid by the Stevedore. There is a lien for these amounts against any recovery herein.

Prior to the accident Nicroli's right elbow showed calcific deposits. Nevertheless this condition did not interfere with his ability to do the work of a cooper, as his pre-accident earnings show. The compensation and medical records show that he was under medical treatment from the time of the accident on August 14, 1956 until about mid-April 1957. He was not malingering. His inability to work during that period was due to his injury. He returned to work as soon as he was discharged by the doctor. His loss of earnings amounting to $4,468.64 was due to the accident.

His medical expenses were fair and reasonable and were necessarily incurred by reason of the accident.

Nicroli testified that when he returned to work in April 1957, he was hampered by his injured elbow and that only his fellow longshoremen's help enabled him to do his work. This is rejected. His arm, at the trial, showed restriction in flexion and extension. This resulted from his injury and these conditions will be permanent. Nevertheless, having observed the demonstration of the effect of these conditions given by Nicroli under his medical expert's direction, I am satisfied that, while somewhat painful and awkward, they did not, in and after April 1957, significantly reduce his ability to do the work of a cooper, which consists of sewing broken bags, repairing broken casks, crates, etc., and some sweeping and shoveling. I find accordingly. I also find that his retirement was not caused by the injury he received in this accident.

His damages for past and future pain and suffering and the permanent restriction of movement of his right arm, I find to be $6,500.

The shipowner owed Nicroli the duty to use reasonable care to provide him with a safe place to work. Furthermore, it owed him the duty to furnish him a seaworthy ship; that is, one on which the area where he was required to work was reasonably fit to permit him to do so in reasonable safety.[1] The shipowner clearly breached each of these duties and these breaches contributed to Nicroli's injuries.[2]

1. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Palazzolo v. Pan-Atlantic S.S. Corp., 2 Cir., 211 F.2d 277, aff'd sub nom. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L. Ed. 133.

2. Cf. Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493.

Nicroli testified that, although he saw that the deck and the skid were wet, he did not notice any melted sugar on either before his fall. This is rejected. Quvus saw melted sugar on the deck where Nicroli fell. It is inconceivable that Nicroli did not see it also. I find he did. However, even if he did not see it, this could only be because he failed to look where he was going, as the merest concern for his own safety required him to do. He was, accordingly, under either hypothesis, negligent in this respect. He was also negligent in that, although the route by which he had come up to No. 1 hatch was free of melted sugar, and although on his return to No. 3 hatch he was so burdened that firm footing was especially necessary for his safety, he nevertheless chose to return by a route the first part of which he knew, or easily could have learned, was covered by melted sugar; and this substance he knew made the footing uncertain and thus quite dangerous. Nicroli's negligence contributed to his injuries.

The total of Nicroli's damages for permanent injury, pain and suffering, lost wages and medical expenses is $11,336.79.[3] I find that Nicroli's negligence contributed equally with that of the shipowner to the accident. Accordingly, he may recover only half his damages, namely, $5,668.40. Judgment for that amount together with interest and costs may be entered in favor of Nicroli against the shipowner.

The Stevedore, even though its contract was with the consignee of the cargo, owed the shipowner the duty to perform the unloading operations in a workmanlike manner.[4] This required the Stevedore to use reasonable care not only to avoid creating but also to eliminate, whether created by it or not, risks of injury arising in the prosecution of the unloading for which the shipowner might be held liable.[5] The Stevedore breached this duty by its failure, before commencing work on the morning of the 14th, to itself correct the dangerous condition or to call on the ship's personnel to do so; and to hold up the work of unloading until correction was effected.[6]

The shipowner is entitled to recover from the Stevedore the total amount of Nicroli's judgment against the shipowner together with a reasonable counsel fee and the reasonable costs of defending this suit. No evidence as to such fees or costs was adduced. If counsel agree on these items, judgment may be entered in favor of the shipowner against the Stevedore for the full amount due the shipowner. If they are unable to agree, the court will fix the amounts after receipt of proofs from counsel.

The Stevedore's counterclaim seeking indemnification from the plaintiff is based on the contention that it is only by reason of the latter's negligence or failure to do his job properly, that the Stevedore can be held liable. Whether in a case where the facts support such a contention indemnification is recoverable by the Stevedore employer from an employee injured in the course of his employment has never been decided on a full trial record, as far as I know.[7] It

---

3. No deduction has been made for income taxes which might have been paid by Nicroli in 1956 and 1957 if he had earned the wages lost as a result of the accident, because no evidence was introduced to show whether he would have had to pay any tax and, if so, how much.

4. Waterman S.S. Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169.

5. De Gioia v. U. S. Lines Company, 2 Cir., 304 F.2d 421, decided June 11, 1962.

6. See Santomarco v. United States, 2 Cir., 277 F.2d 255; De Gioia v. U. S. Lines, supra.

7. Compare Johnson v. Partrederiet Brovigtank, 202 F.Supp. 859 (S.D.N.Y.1962) (Feinberg, J.), and Cavelleri v. Isthmian Lines, Inc., 189 F.Supp. 525 (S.D.N.Y. 1960), reargument denied, 190 F.Supp. 801 (1961) (I. Kaufman, J.), with Malfitano v. King Line, Ltd., 198 F.Supp. 399 (S.D.N.Y.1961) (Moore, C. J.). Judge Feinberg and Circuit Judge Kauf-

cannot be decided here either, for the facts found here do not support the contention. As the findings show, the Stevedore's liability here results from the failure of its supervisory employees to hold up work on the morning of the 14th until the dangerous condition was corrected. Accordingly, the Stevedore's counterclaim against Nicroli must be dismissed. A judgment so providing may be entered.

man, then a District Judge, denied motions to amend the pleadings to assert the counterclaim. Circuit Judge Moore, sitting by designation in the District Court, denied the plaintiff's motion to strike the counterclaim asserted in the original pleadings. The Malfitano case has not yet come to trial. In the instant case, a motion to amend the pleadings to assert the counterclaim was granted by Judge Metzner.