Carl W. SIMPSON, Plaintiff,

v.

ROYAL ROTTERDAM LLOYD, Defendant and Third-Party Plaintiff,

v.

ASSOCIATED OPERATING COMPANY, Third-Party Defendant.

United States District Court
S. D. New York.

Jan. 17, 1964.

948

Sylvia Miller, New York City, for plaintiff; Chester A. Hahn, New York City, of counsel.

Burlingham, Underwood, Barron, Wright & White, New York City, for defendant and third-party plaintiff; William M. Kimball, New York City, of counsel.

Fogarty & Schreiber, New York City, for third-party defendant; John H. Mulvehill, of counsel

FEINBERG, District Judge.

This is a non-jury diversity case involving what is rapidly becoming in this Court the eternal triangle—longshore-

man versus shipowner, and shipowner versus stevedoring company. For the reasons indicated below, I find for the longshoreman in the main action and for the shipowner in the action over.

## I

Plaintiff longshoreman was injured on September 19, 1957, aboard the S.S. Bantam owned by the defendant Royal Rotterdam Lloyd ("Shipowner"). The S.S. Bantam was discharging cargo at Pier One, Bush Terminal, Brooklyn. Plaintiff, employed as a hold man by the Associated Operating Company ("Stevedore"), was unloading ingots of tin in the lower number five hold at the time of his injury.

Plaintiff's left foot was fractured when one of the ingots fell upon it. These ingots were molded blocks of tin, approximately eighteen inches long, six inches wide at the top, four inches wide at the bottom, and six inches high. At the top were horns, metal-hand grips which extended about two inches from the top at both sides. The ingots weighed about one hundred pounds apiece and were tiered six high running in the same direction. Plaintiff's job was to lift each block individually, turn around, and place that ingot in a box beside him.[1] While turning, after lifting one of the top ingots, the one immediately below fell upon plaintiff's feet, injuring his left foot.[2]

Plaintiff claims that the ship was unseaworthy and the Shipowner negligent because of improper stowage of the tin ingots. Specifically, it is claimed that the stowage was improper because (1) it was tiered too high for safety; (2) the ingots were piled running in the same direction, and not in criss-cross fashion which would have been safer; (3) some ingots were edge up; and (4) there was grease on the ingots.[3]

A ship is unseaworthy if it is not reasonably fit for its intended use.

Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). Improper and dangerous stowage would constitute unseaworthiness. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Palazzolo v. Pan-Atlantic S.S. Corp., 211 F.2d 277, 279 (2 Cir. 1954), aff'd sub nom., Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). A shipowner is negligent if he knows of, or should know of, a dangerous condition which is reasonably likely to cause injury, and does not exercise the care which a reasonably prudent man would have exercised under the circumstances. Gutierrez v. Waterman S.S. Corp., supra; Ktistakis v. United Cross Nav. Corp., 316 F.2d 869 (2 Cir. 1963). A longshoreman unloading cargo aboard a ship may recover from the ship for injuries caused by an unseaworthy condition or negligence of the shipowner. E. g., Gutierrez v. Waterman S.S. Corp., supra; Seas Shipping Co., v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Mosley v. Cia Mar Adra S.A., 314 F.2d 223, 227 (2 Cir. 1963).

Plaintiff's contention that the tiers were piled too high and not crisscrossed for safety rested upon the testimony of another longshoreman, Cusamano. Cusamano, a member of plaintiff's working gang on the day of the injury, testified that in his experience the ingots should have been tiered only three high and should have been piled in criss-cross fashion.[4] However, an expert, Hanley, called by Shipowner, testified that the safe height to which tiers of ingots could be piled depends upon many factors,[5] one of which is the part of the ship where the ingots are carried. In the lower hold of a ship, where the ingots were in this case, they could safely be piled six high, and the expert further testified that he had seen ingots stowed to this

---

1. Transcript, p. 33 [Transcript hereinafter referred to as "Tr."].

2. Tr. pp. 33–34, 110.

3. Tr. pp. 232–33.

4. Tr. pp. 105–09.

5. Tr. p. 230. See also Tr. pp. 190–94.

height.[6] Cusamano testified that he had only observed tin piled three high in the tween deck, but had no knowledge of how high ingots were usually piled in the lower hold.[7] I find that there was no improper stowage due to the height of the tiers.

Hanley also testified that ingots were not customarily stowed criss-cross aboard ship,[8] but were usually stowed running in the same direction, as they were aboard the Bantam. Although customary practice is not necessarily determinative of safe practice, there is not enough evidence in this case to conclude that the arrangement of the ingots was improper.

Some of the ingots were lying with their edges up. Again the expert called by Shipowner testified that this would be unusual but not a hazard, since the men would pick an ingot up, after righting it, the same way as ingots piled with their tops up.[9] There is no evidence that ingots with their edges up are more likely to fall than ingots piled with their tops up.

Plaintiff finally claims that Shipowner is liable under both the unseaworthiness and negligence theories because there was grease on the ingots. Both plaintiff and Cusamano testified that they found grease around the lower hold and on the tin ingots when they entered the hold to commence work.[10] There was also grease on the ladder leading to the hold, and grease filled rags were scattered about.[11] The longshoremen complained to the hatch boss, Cipriano (also an employee of third-party defendant Stevedore), of the greasy condition of the hold and cargo,[12] and the longshoremen were warned to work with care.[13] An officer of the ship,[14] after being informed of the conditions by the hatch boss, inspected the hold in person and actually saw the grease.[15] There is no evidence in the record of any conversation or instructions given by the ship's officer. At no time did Shipowner or Stevedore's hatch boss order the men to stop work[16] until the grease was completely removed or the condition was otherwise made less dangerous.

I find that the ingots in a greasy condition in this case constituted an improper stow and rendered the vessel unseaworthy. Greasy ingots are likely to slip and make the stow not reasonably fit for its intended disposition.

Since Shipowner's officer had actual knowledge of the greased condition of the ingots, which made the area an unsafe place in which to work, I also find Shipowner negligent. Although the record is not completely clear on what caused the ingot to fall when it did, there is evidence that it "slid out" and that "there was grease on it."[17] I conclude that the greased condition of the ingots was the proximate cause of plaintiff's injury.

There was no contributory negligence on the part of plaintiff. He was in the hold working pursuant to instructions. Even if a bump set in motion the ingot that fell on plaintiff, and there is no evidence that there was such a bump,[18] I would not find this a negligent act.

6. Tr. pp. 230–31.

7. Tr. p. 200.

8. Tr. pp. 231, 242. The ingots were tiered criss-cross in piles of twenty-five on the dock. The reason for criss-crossing on the dock was to facilitate accurate counting. Tr. p. 246.

9. Tr. p. 243.

10. Hanley, the expert called by the Shipowner, testified that ingots were normally shipped in a dry condition. Tr. pp. 226–27.

11. Tr. pp. 11–15, 95–97, 173.

12. Tr. pp. 53, 98, 171.

13. Tr. pp. 53, 55, 75.

14. Tr. p. 80.

15. Tr. pp. 76–80, 99.

16. Tr. pp. 171–72.

17. Tr. pp. 110–11.

18. Such a description appears in a written statement given by Cusamano (Shipowner Ex. D), which was introduced to impeach his credibility. Tr. p. 256. Cusamano did not testify to this on oral examination.

Plaintiff received a crush injury to the left foot and fracture of the left second metatarsal bone.[19] As a consequence, he visited a doctor forty-five times from September 1957 to February 3, 1958, receiving primarily whirlpool and diathermy treatments. On the latter date, he received another injury to his left foot and visited the same doctor an additional thirty-six times. Fifteen of these later visits were attributable to the February 3, 1958 injury.[20] Thus, in all, the injury in question here resulted in sixty-six visits to a doctor and three sets of X-rays for which plaintiff incurred bills of $330. Although Shipowner claims that the number of visits was grossly excessive, no evidence was introduced as to how many visits would be proper for this type of injury. Under these circumstances, the Court will allow the full amount claimed as the fair and reasonable value for medical services incurred as a result of the accident on September 19, 1957. Plaintiff's injury prevented him from working from September 24, 1957 [21] to the middle of January 1958,[22] for a total loss in wages of at least $1,540.32.[23] Plaintiff has been left with a mild partial disability.[24] I also award $1,250 for the nature and extent of his injuries and for pain and suffering—a total award of $3,120.32.

## II

Shipowner seeks indemnity from Stevedore, plaintiff's employer, for the award to plaintiff. The evidence shows that Stevedore had actual notice of the grease on the ingots by observation of its hatch boss (Cipriano) and Cusamano,[25] to whom the employees in the hold, including plaintiff, also looked for supervision. This condition was brought to the attention of a ship's officer.[26] However, Stevedore's employees continued to unload the cargo in its unsafe condition.

In Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that there is an implied warranty in a stevedoring contract to perform the job contracted for in a "workmanlike" manner. Applied to the handling of cargo, there is an obligation on the part of the stevedore to perform its duties with reasonable safety. Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).[27] A shipowner has a right of action against a stevedore when the latter's breach of its obligation to perform in a workmanlike manner results in liability of the ship to a third party (here, plaintiff longshoreman). As between a shipowner and stevedore, the latter "cannot use the shipowner's failure to discover and correct the [stevedore's] own breach of warranty as a defense," (Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra 350 U.S. at 134–135, 76 S.Ct. at 237–238, 100 L.Ed. 133) to a suit by the shipowner for reimbursement of any recovery against it by an employee of the stevedore. In Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413

19. Tr. p. 120. An X-ray taken on December 20, 1957, three months after the accident, clearly showed the fracture line. Tr. pp. 126–29 (Plaintiff Ex. 2). The fracture line did not appear on X-rays taken immediately after the injury. However, a fracture line may not appear for a week or two. Tr. pp. 145–46.

20. Tr. pp. 138–39.

21. Tr. pp. 43–44, 119.

22. Tr. pp. 131, 153.

23. Plaintiff earned a minimum of $3,754.63 in the first three quarters of 1957 (Plaintiff Ex. 1), or an average of $96.27 per week. Multiplying this figure by the six-

teen weeks plaintiff was not working gives $1,540.32.

24. Tr. pp. 137, 160–61 (stipulation that another doctor found 3% disability due to September 19, 1957 accident).

25. Tr. pp. 53, 98, 171.

26. Tr. pp. 76–80, 99.

27. The contract here (Shipowner Ex. E) obligates the Stevedore to "provide all necessary * * * stevedoring supervision as are needed for the proper and efficient conduct of the work." Clause 2–b. This language also appeared in the contract in Weyerhaeuser S.S. Co. v. Nacirema Operating Co., supra.

(1959), this doctrine was extended to allow recovery by a shipowner against a stevedore for injury to a third party where there was a pre-existing condition (an improperly set cut-off device) which amounted to unseaworthiness, and the negligence of the stevedore brought this unseaworthiness into play. See also Calmar S. S. Corp. v. Nacirema Operating Co., 266 F.2d 79 (4 Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959) (ship allowed recovery although it supplied a defective light which was then negligently handled by stevedore). Moreover, courts have allowed indemnification of the shipowner where the shipowner was found negligent to a longshoreman, without requiring a finding of unseaworthiness as well. Drago v. A/S Inger, 305 F.2d 139 (2 Cir.), cert. denied, Daniels & Kennedy Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962); Williams v. Pennsylvania R. Co., 313 F.2d 203 (2 Cir. 1963).

 I conclude that Stevedore in this case breached its obligation to Shipowner to perform its services in a workmanlike manner. Although it has been held that there is no duty on the part of a stevedore to inspect a vessel prior to beginning work, Orlando v. Prudential S. S. Corp., 313 F.2d 822 (2 Cir. 1963), once a stevedore has knowledge of an unsafe condition, there is an obligation upon the stevedore either to remedy the condition or to cause the ship to do so. Tedeschi v. Luckenbach S. S. Co., 324 F.2d 628, 2 Cir., 1963; Caputo v. United States Lines Co., 311 F.2d 413, 415 (2 Cir.), cert. denied, Imparato Stevedoring Corp. v. United States Lines Co., 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963); Drago v. A/S Inger, supra; DeGioia v. United States Lines Co., 304 F.2d 421, 424 (2 Cir. 1962); Misurella v. Isthmian Lines, Inc., 215 F.Supp. 857, 863 (S.D. N.Y.1963), appeal docketed, No. 28350, 2 Cir., July 12, 1963; Nicroli v. Den Norske Afrika-OG Australielinie Wilhelmsens Dampskibs-Aktieselskab, 210 F. Supp. 93, 97 (S.D.N.Y.1962). This obligation of a stevedore includes ordinarily the duty [28] not to continue work until a known dangerous condition has been made reasonably safe.[29] Caputo v. United States Lines Co., supra; United States v. Arrow Stevedoring Co., 175 F.2d 329, 331 (9 Cir.), cert. denied, 338 U.S. 904, 70 S.Ct. 307, 94 L.Ed. 557 (1949); Misurella v. Isthmian Lines, Inc., supra; Cassone v. Compania Anonima Venezolana De Navegacion, 1962 A.M.C. 1347, 1351 (S.D.N.Y.); Nicroli v. Den Norske Afrika-OG Australielinie Wilhelmsens Dampskibs-Aktieselskab, supra; Hugev v. Dampskisaktieselskabet Int'l, 170 F. Supp. 601, 608 (S.D.Cal.1959), aff'd sub nom., Metropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l, 274 F.2d 875 (9 Cir.), cert. denied, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960); Revel v. American Export Lines, Inc., 162 F.Supp. 279, 287 (E.D.Va.1958), aff'd, 266 F.2d 82 (4 Cir. 1959).[30]

 Tin ingots covered with grease constitute a danger to the longshoremen

---

28. See note 30 infra.

29. A safety code (Shipowner Ex. F), published by the New York Shipping Association, Inc., of which Associated Operating Company was a member in September 1957 (Tr. p. 238), states that work should be stopped temporarily to prevent injury where the condition so warrants. SAFETY AND WORKMEN'S COMPENSATION INSURANCE COMMITTEE OF THE NEW YORK SHIPPING ASSOCIATION, INC., MARITIME SAFETY CODE 7, 8 (1955).

30. There is a contra line of cases. Smith v. Pan-Atlantic S.S. Corp., 254 F.2d 600 (3 Cir. 1958), affirming, 161 F.Supp. 422 (E.D.Penn.1957); United States v. Harrison, 245 F.2d 911 (9 Cir. 1957); Thompson v. Trent Maritime Co., 222 F. Supp. 221 (E.D.Penn.1963). See Hodgson v. Lloyd Brasileiro Patrimonio Nacional, 294 F.2d 32 and dissent by Judge Biggs at 36 (3 Cir. 1961), cert. denied, 369 U.S. 848, 82 S.Ct. 931, 8 L.Ed.2d 8 (1962). This case does not require consideration of the situation where the stevedore continues work at the explicit request of the ship after calling the ship's attention to the unsafe condition. United States v. Harrison, supra; Torres Cruz v. Hudson S.S. Co., 206 F.Supp. 216 (D.P.R.1962), aff'd sub nom., Hudson S.S. Co. v. Colon, 314 F.2d 44 (1 Cir. 1963).

who are to unload them. Stevedore, through its hatch boss, had actual notice of the dangerous condition.[31] Stevedore breached its obligation to perform a workmanlike job by continuing to unload the cargo in the condition it was in. Merely showing the unsafe condition to the ship's officer was not sufficient to discharge the obligation of Stevedore, unless the condition was remedied. Wiping the tops of the ingots with rags already greasy[32] and cautionary words by the hatch boss to the men to be careful and by the men to each other[33] do not discharge the obligation of Stevedore to Shipowner.

It is true that Stevedore's breach of its duty does not automatically require a judgment for Shipowner on its claim over since there is some type of conduct on the part of Shipowner which would still preclude indemnity from Stevedore. As expressed in Weyerhaeuser S.S. Co. v. Nacirema Operating Co., supra (355 U.S. at 567, 78 S.Ct. at 441, 2 L.Ed.2d 491):

> "If * * * [the stevedore] rendered a substandard performance which led to foreseeable liability of [the ship], the latter was entitled to indemnity *absent conduct on its part sufficient to preclude recovery.*" (Emphasis added.)

What conduct by the ship is "sufficient to preclude recovery" has not yet been clearly delineated by the courts.

From the record in this case, the only conduct on the part of Shipowner which might bar indemnity would be the fact that, at the request of Stevedore's hatch boss, one of the ship's officers visited the hold in which the greasy ingots were stowed. There was insufficient evidence at trial that the officer of the ship was asked to remedy the unsafe condition, or that he expressed any opinion on whether the work should be continued, or that he told Stevedore that he felt the stowage was safe. See Pettus v. Grace Line, Inc., 305 F.2d 151 (2 Cir. 1962). There do not seem to be any cases in this Circuit suggesting that under these facts Shipowner should be barred from enforcing its indemnity right.

In Williams v. Pennsylvania R. Co., supra, indemnity was allowed where a longshoreman was injured when the ship's hoist operator raised a boom upon command of the stevedore's foreman, although the hoist operator saw the longshoreman in a precarious position. In Misurella v. Isthmian Lines, Inc., supra, a longshoreman working aboard ship was injured by accumulations of carbon monoxide fumes from gasoline operated machines. Judge Weinfeld of this Court concluded that the ship was both negligent and unseaworthy in not providing proper ventilation. The evidence showed that the ship's mate was repeatedly asked to turn on the ventilation system, but claimed that he could not find the key. Also, the stevedore could not use his own portable ventilating equipment, because the electric current on the ship was not turned on. Nevertheless, the Court held that the ship's conduct did not relieve the stevedore of its breach of warranty.[34]

It can hardly be said that all aspects of the rights between a shipowner and a stevedore have been clearly

---

31. Tr. pp. 53, 98, 171.

32. Tr. pp. 172–73. There was testimony by plaintiff that the men were not told to wipe up the grease as best they could (Tr. p. 54); however, Cusamano testified that they were told to wipe the grease as best they could (Tr. p. 172), but were neither told to nor did they stop work (Tr. p. 171).

33. Tr. p. 176.

34. In Drago v. A/S Inger, 305 F.2d 139 (2 Cir.), cert. denied, Daniels & Kennedy, Inc. v. A/S Inger, 371 U.S. 925, 83 S.Ct. 292, 9 L.Ed.2d 232 (1962), the Court held that constructive knowledge by the shipowner of an unsafe condition was not sufficient "conduct" to bar indemnity. Cf. Nederlandsch-Amerikaansche-Stoomvaart-Maatschappij v. Vassallo, 365 S.W.2d 650 (Ct.Civ.App.Texas), cert. denied, Holland-America Line v. Texports Stevedoring Co., 84 S.Ct. 443 (1963), (indemnity barred by conduct of ship, where there is express provision by ship to supervise stevedoring operations).

marked out by prior decisions. Nevertheless, under the facts in this case, I hold that the observation by a ship's officer of an unsafe condition without more is not sufficient conduct to bar indemnity from a stevedore. I am mindful of the fact that the function of the doctrine of unseaworthiness and the corollary doctrine of indemnification "is allocation of the losses caused by shipboard injuries to the enterprise, and within the several segments of the enterprise, to the institution or institutions most able to minimize the particular risk involved." [35] Where an obvious defect is closely related to the unloading of cargo, the job for which a stevedore is employed and for which he is presumably expert, it would seem appropriate that, unless unusual factors are present, the stevedore should normally bear the burden of a recovery caused by the defect. By placing upon the stevedore the duty of stopping work until the condition is corrected, the "particular risk involved" may best be minimized, since the longshoremen performing services aboard a ship presumably take their orders from the stevedore. Moreover, even though an unsafe condition is obvious, it can only be remedied when attention is called to it. Since the stevedore is most intimately concerned with the condition of cargo when it is being unloaded, it is more likely that it will have notice of obvious defects affecting unloading than anyone else aboard the ship. Therefore, in the absence of special circumstances, placing the duty on the stevedore to remedy the obvious defect or stop work until it is remedied puts the burden, it seems to me, where it usually belongs.

Finally, Stevedore argues that even if Shipowner is not precluded from recovering from Stevedore for Stevedore's breach of warranty, Stevedore conversely has a similar cause of action against Shipowner. Stevedore contends that it has a valid counterclaim against Shipowner for breach by Shipowner of its implied warranty to Stevedore to furnish Stevedore and its employees with a safe place to work.[36] Apparently, no court has held that such a cause of action exists, although the possibility that it does has been mentioned.[37] Stevedore suggests that this conceptual device would offer a way of dividing damages between the ship and the stevedore without diminishing the protection afforded the injured employee. It has been suggested that, as between the shipowner and the stevedoring company, mitigation of the all-or-nothing impact of the existing doctrines might indeed be attractive,[38] but the facts here do not justify an attempt to do so, even if such an attempt were warranted.[39] The contract in this case between Shipowner and Stevedore expressly contemplates that cargo may arrive for unloading not in customary good order, in which event Stevedore would be entitled to additional compensation for the extra care and manpower needed to discharge the cargo.[40] The inclusion of an express clause concerning varying conditions in the stow negates any inference of an implied warranty as to the safety of the stow. Under these circumstances, I find that there was no implied warranty by Shipowner to provide Stevedore with seaworthy stowage in a greaseless hold, and, therefore, the counterclaim is without merit.

35. See DeGioia v. United States Lines Co., 304 F.2d 421, 426 (2 Cir. 1962).

36. Memorandum of Law filed by Stevedore after trial, pp. 4, 8.

37. See Williams v. Pennsylvania R. Co., 313 F.2d 203, 213 (2 Cir. 1963); Pettus v. Grace Line, Inc., 305 F.2d 151, 156 (2 Cir. 1962) (Clark, J., dissenting).

38. Gilmore and Black, Admiralty 374 (1957).

39. For the proposition that there is no implied warranty running from a shipowner to a stevedore to furnish the latter with a safe place to work, see Hugev v. Dampskisaktieselskabet Int'l, 170 F.Supp. 601 (S.D.Cal.1959), aff'd sub nom., Metropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l, 274 F.2d 875 (9 Cir.), cert. denied, 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960); Mickle v. The Henriette Wilhelmine Schulte, 188 F.Supp. 77 (N.D.Cal.1960).

40. Shipowner Ex. E, clauses 12, 14.

On the basis of all the evidence before me and my estimate of the credibility of the witnesses, I hold that Shipowner violated its obligations to supply plaintiff with a seaworthy ship and a safe place to work and is, therefore, liable to plaintiff in the amount of $3,120.32, that Stevedore violated its warranty to perform its services in a workmanlike manner, that Shipowner's own conduct was not sufficient to preclude recovery, and that Stevedore's counterclaim for breach of implied warranty is groundless. The foregoing constitutes the Court's findings of fact and conclusions of law under Rule 52, Fed.R.Civ.P. In accordance with the stipulation of the parties [41] on Shipowner's claim against Stevedore, the issue of liability for attorneys' fees and costs has been reserved for further hearing, if the parties fail to agree on the amounts involved.

Submit order in accordance with this opinion.