**J. D. JACKSON**

v.

**LLOYD BRASILEIRS PATRIMONIO NACIONAL**

v.

**ATLANTIC AND GULF STEVE-DORES, INC.**

No. 68–G–158.

United States District Court, S. D. Texas, Galveston Division.

Dec. 22, 1970.

S. Ravkind, Mandell & Wright, Houston, Tex., for plaintiff.

V. W. Rehmet and J. I. Smith, Jr., Barrow, Bland & Rehmet, Houston, Tex., for defendant third party plaintiff.

A. J. Watkins, Watkins, Hamilton & Kolb, Houston, Tex., for third party defendant.

## MEMORANDUM OPINION AND ORDER

NOEL, District Judge.

This is an action by a longshoreman to recover damages for personal injuries he sustained while working aboard the S. S. Marila. The cause was tried to the Court sitting without the assistance of a jury on the issues of liability only. The Court has jurisdiction.

The parties' contentions were summarized in the pretrial order. The plaintiff longshoreman contended that his injuries were the proximate result of the

ship's winches being maintained in an unseaworthy condition, and of the negligence of the ship's crew for failing to: (1) repair the winches; (2) order the stevedore to repair same; and (3) order the longshoremen to cease operating same until they were in a seaworthy condition. The defendant shipowner denies the plaintiff's allegations, and contends the plaintiff negligently caused his own injuries. Seeking indemnification, the shipowner impleaded the stevedore who employed the plaintiff. The shipowner predicates its indemnification claims upon an express condition in the agreement entered between the shipowner and the stevedore; and, secondly, upon its belief that the stevedore breached its implied contractual warranties. The third party defendant stevedore answered that it was not obligated to indemnify the shipowner because: (1) the shipowner's breach of its promise to provide adequate winches for the use of the stevedore released the stevedore from its contractual obligations; and (2) its belief that: (a) it did not breach its warranties; and (b) if it did breach its warranties, that the shipowner's conduct was a substantial cause of the injury and precluded indemnification.[1]

On April 20, 1968, J. D. Jackson was injured while working aboard the S. S. Marila as a longshoreman. The vessel was owned by the defendant. Jackson was employed by the third party defendant to perform stevedoring services aboard the vessel.

Prior to the occurrence and injury in question, the shipowner and the contracting stevedore had entered a written contract governing the respective obligations of the parties in connection with the loading and unloading of the shipowner's vessels by the stevedore.[2] Of importance in this litigation was the shipowner's promise to provide the stevedore adequate booms and winches to perform its services,[3] and the stevedore's promise to indemnify the shipowner against personal injury claims arising during the stevedoring work even though caused by the indemnitee's tortious conduct.[4]

On the day plaintiff was injured he was a member of a gang of longshoremen assigned the task of cleaning out the lower hold adjacent to hatch No. 3 of the S. S. Marila. To accomplish this, the stevedore ordered its men to use the boom and winch equipment provided by the ship. The longshoremen attached a

1. The stevedore also contended that Jackson was not injured while performing work covered by the indemnification provisions. Upon analysis, this argument is without merit because: (1) plaintiff was injured while performing tasks the stevedore contracted to furnish the shipowner; (2) the stevedore's indemnity specifically promised to cover injuries caused by the indemnitee's negligence; and (3) the tortious conduct of both parties to the indemnity contract was a proximate cause of the plaintiff's injuries. C. f.: Martin Wright Electrical Co. v. W. R. Grimshaw Co., 419 F.2d 1381 (5th Cir. 1969), cert. denied 397 U.S. 1022, 90 S.Ct. 1263, 25 L.Ed.2d 532 (1970); Alamo Lumber Co. v. Warren Petroleum Co., 316 F.2d 287, 289–291 (5th Cir. 1963); Senecca v. California Oil Co., 65 A.M.C. 1235 (U.S.D.C.W.D.La.1964).

2. This contract was admitted into evidence as defendant's first exhibit.

3. The contract reads: "Equipment: The ship is to supply booms, adequate winches,

in good order and with sufficient steam or current for their efficient operations; * * *."

4. The indemnity clause reads: "Contractor (stevedore) will at all times indemnify and save harmless the Owner, against any loss or expense by reason of any claim, or claims, or liability for injury to persons arising out of or occurring in connection with the execution of the Work provided for in this Contract; including any and all loss, cost, damage or expense which the owner may sustain or incur on account of any claim, demand or suit made or brought against the Owner by or on behalf of any employee of the Contractor, whether or not such claim, demand or suit be based upon the alleged active or passive negligence, participation in the wrong, or upon any alleged breach of any statutory duty or obligation on the part of the owner and/or their agents, servants or employees, or whether such claim be based on the alleged unseaworthiness of a vessel."

topless fifty-five gallon steel drum to a cable. The cable was then run through the guides on the ship's boom, and was attached to the vessel's winch apparatus. The winch was used to raise and lower the drum. The winches were electrically powered. The winch operator would lower the drum through the hatch in the main deck, down to and through the hatch in the tween deck, and down to the deck of the lower hold. When the drum reached the lower hold, the longshoremen assigned the chore of cleaning the hold would fill the drum with refuse to be discarded from the ship. The winch operator would then cause the winch to raise the drum to the main deck where another longshoreman would pull the drum away from the hatch by the use of a tag line attached to the drum, and empty the drum. Because the winch operator could not watch the progress of the drum upon its journey to and from the lower hold, a longshoreman was stationed adjacent the main deck hatch. This man would watch the drum's progress and signal the winch operator when to start, stop, or regulate the speed of the winch. To facilitate the drum's passage through the tween deck hatch, a longshoreman was stationed there to guide the drum. Complicating the drum's passage through the tween deck hatch was the fact that the longshoremen had reduced the size of the hatch opening by placing hatch boards across the hatch. This was done to facilitate the loading of cargo. The opening which remained was of sufficient size to allow the drum to pass through, but one which required the constant attention of a longshoreman to insure that the drum did not strike the hatch boards.

The hatch boards were not placed tightly together. Instead, the boards were arranged so that grain could pass between them and pass into the lower hold. The openings between the boards, however, were not large enough to prevent a man from walking safely over them.

In order to perform his tasks properly, the guide man was required to stand upon the grid formed by the hatch boards and to use his hands to guide the drum through the tween deck hatch. The job of guiding the drum through the tween deck was a one-man job.

Plaintiff was an experienced longshoreman, familiar with the requirements of the tasks assigned to him on the day when he was injured. He commenced work on the morning of April 20, 1968, at approximately 7:00 a. m. and was injured at approximately 11:00 a. m. of the same day.

Leslie Charping was the gang foreman assigned by the stevedore to supervise Jackson's crew. The stevedore's walking foreman was Mr. Morgan. Morgan was charged with the duty of supervising all the stevedore's employees on the vessel that day.

Prior to the accident, a longshoreman named Harry C. Rhew had been running the two ship's winches which were adjacent to hold No. 3 where Jackson's crew was working. Either of the winches would normally have been adequate to hoist the fifty-five gallon drum being used in the cleanup operation.

Rhew testified by deposition [5] and at the trial that neither of the winches were operating properly. He stated that neither winch would respond accurately to its controls. He stated that without a command from the winch operator the winch would change speed and would raise or lower cargo at a fast unsafe speed. Rhew pointed out that the winch to which the drum was rigged was the more unpredictable of the two winches, and therefore the more dangerous for the longshoremen to use in the cleanup operations. He also pointed out that he had operated numerous winches of a similar type on the Galveston, Texas waterfront, and that these winches normally did not operate in such an erratic manner.

Rhew testified that he informed the stevedore's representatives—namely its

---

5. Plaintif offered Rhew's deposition into evidence. There were no objections, and it was admitted.

**560**

gang foreman and walking foreman—of the winches' behavior. The two foremen then informed the shipowner's representative—the ship's officer on duty, a mate —of this problem.

Rhew and Charping [6] both testified that they informed the stevedore's walking foreman of the winches' behavior, and that the two foremen sent for the ship's mate and informed him of this fact.

Although the testimony of Rhew and Charping is not as clear on this point as the trier of fact might prefer, the reasonable inferences to be drawn from their testimony preponderate to the conclusion that the following conversation took place between the two foremen and the ship's mate. The testimony persuades the Court that the mate and the two foremen agreed that the longshoremen should continue using the winch rather than cease work. They reached this conclusion because they believed the cleanup crew's need for the winch was almost completed, and because they preferred to risk the safety of the longshoremen rather than to take the time to repair the winch, or to rerig the drum to the better operating winch and repair it. This conversation leads the Court to the obvious and inescapable conclusion that the representatives of the stevedore and the shipowner, like the ship's officers in Eugene O'Neill's play, *The Hairy Ape*, were more concerned with the speed in which the job could be completed than with the safety of the crew.[7]

Prior to Jackson's injury, the gang foreman, Mr. Charping, assumed the controls of the winch hoisting the drum. Having relieved Rhew, Mr. Charping directed him to serve as guide man, and directed Jackson to serve as the signal-man on the main deck. After a few loads were removed from the hold, Charping directed Jackson to assume the guide position on the tween deck hatch boards because Rhew had little experience at this task and Jackson was considered an able man. Rhew replaced Jackson at the signalman position. He then commenced to watch the hoisting operations and to signal the winch operator.

None of the parties offered evidence informing the Court why it was necessary to substitute Jackson for Rhew at the guide position. It is reasonable to infer from the evidence which was submitted, however, that the switch was occasioned because the erratic behavior of the winch caused Charping to conclude that Jackson's experience would enable him to handle any problems which might arise. Therefore, it is further reasonable to infer that when Jackson assumed the guide position, he was prepared for trouble of the nature which a sudden increase in the speed of the drum could cause and would have been very attentive to the drum's progress and to his own safety.

After Jackson assumed the guide position, the drum made one and one-half complete trips to and from the lower hold. During the drum's upper journey from the lower hold, it struck him.

Jackson and Rhew were the only persons in a position to see the accident and injury to Jackson. Although Jackson's trial testimony differed in many instances from that which he gave during his prior deposition, the Court finds Jackson's trial testimony to be more persuasive because it was substantiated by the later testimony of Rhew. Furthermore, the Court does not believe the material

6. Without objection plaintiff offered Charping's deposition into evidence, and it was admitted by the Court.

7. a. None of the parties offered the testimony of the other parties to the conversation. The inference is therefore inescapable that the parties—the ship's mate and the walking foreman—would confirm the Court's interpretation of the conversation.

   b. None of the parties offered clear testimony on the difficulty or time necessary to repair either winch. None of the parties offered any testimony as to the actual difference in safety which could have been achieved by rerigging the drum to the other winch.

differences in plaintiff's testimony were the result of any attempt to deceive the Court, but instead were produced by Jackson's injury, and the refreshing of his memory which resulted when, not being subjected to the rule, he was able to hear the prior statements of his counsel.

Rhew was called by the defendant. He had not heard the prior statements of counsel, or the testimony of witnesses. He testified that he observed the events leading up to the accident. He observed that the longshoremen in the lower hold had filled the drum with trash, including dunnage which protruded from the edge of the barrel. The dunnage increased the drum's working diameter slightly. He testified that he signaled Charping to raise the drum, and that the winchman caused the drum to rise at slow speed. He noted that prior to the accident Jackson was using his hands to guide the winch cable and was in a position to observe the drum's upward progress. Without equivocation in both his deposition and on cross examination, Rhew testified that as the drum was approaching the tween deck hatch, the winch suddenly and drastically increased its speed causing the drum to shoot up, hit the lower edge of the tween deck hatch boards, and with a horizontal motion to spring over the boards and strike Jackson. The blow caused Jackson to tumble over the edge of the hatch boards and fall into the hold. Plaintiff was saved from more severe injury because he was able to grasp the hatch boards thereby preventing his falling thirty feet to the deck below.

*Findings of Fact and Conclusions of Law*

■ 1. The vessel was unseaworthy because its winches were not adequate for their intended use. This unsea-

worthiness was a proximate cause of plaintiff's injuries. Mahnich v. Southern Steam Ship Co., 321 U.S. 96, 104, 64 S.Ct. 455, 88 L.Ed. 561 (1943); The Osceola, 189 U.S. 158, 178, 23 S.Ct. 483, 47 L.Ed. 760 (1903); M. J. Norris, The Law of Maritime Personal Injuries, § 29, 36 at 57, 70–72 (2nd Ed. 1966).

■ 2. The shipowner—through the acts of its agents—negligently breached its duty to provide plaintiff a safe place to work by reason of its agents' failure: (a) to repair the ship's winches; (b) to order the stevedore to repair the winches; and (c) to order the stevedore or its employees to cease using the winches once its agents ascertained they were unseaworthy. C. O. Bue, Jr., Admiralty Law in the Fifth Circuit—A Compendium for Practitioners, 4 Hou.L. Rev. 347, 387 (1966). This negligence was a proximate cause of the plaintiff's injuries.

3. The stevedore's negligence was a proximate cause of Jackson's injuries. Once the stevedore's agents ascertained that the ship's winches were not operating safely, they had an affirmative duty to order their men to cease using the defective winches. T. Smith and Sons, Inc. v. Skibs A/S Hassel, 362 F.2d 745, 747 (5th Cir. 1966); Olin Mathieson Chemical Corp. v. United Stevedoring Division, States Marine Lines, 317 F.Supp. 1373 (S.D.Tex.1969) (per Seals, J.).[8] Simpson v. Royal Rotterdam Lloyd, 225 F.Supp. 947, 952–953 (S.D.N.Y. 1964); Nicroli v. Den Norske Afrieka-Og Australielinie, etc., 210 F.Supp. 93, 97 (S.D.N.Y.1962); affd. 322 F.2d 651 (2nd Cir. 1963).

■ 5. Although the shipowner materially breached its contract with the stevedoring company by failing to provide adequate winches,[9] this breach did

---

8. This opinion was recently sent to the West Publishing Company by the court.

9. If the Court's determination that the stevedore waived the shipowner's breach is incorrect, then the Court concludes the following authorities dictate that the

shipowner's breach entitled the stevedore to rescind its express duty to indemnify the shipowner: General Insurance Co. of America v. Fleeger, 389 F.2d 159, 161 (5th Cir. 1968); Hiern v. St. Paul-Mercury Indemnity Co., 262 F.2d 526, 528–529 (5th Cir. 1959); 41 Am.Jur.2d In-

not entitle the stevedore to rescind its express contractual duty to indemnify the shipowner. The stevedore's continued use of the winches after its personnel discovered them to be unseaworthy constituted a waiver of such breach. Once a breach of contract is waived, it cannot be used as the basis for rescission. Hugev v. Dampskisaktieselskabet, Int., 170 F.Supp. 601, 611 (S.D.Cal. 1959); affd. sub nom. Metropolitan Stevedoring Co. v. Dampskisaktieselskabet, Int., 274 F.2d 875 (9th Cir. 1960); *see also:* Pasquel v. Owen, 186 F.2d 263, 270–271 (8th Cir. 1950); Knutson v. Metallic Slab Form Co., 128 F.2d 408, 411 (5th Cir. 1942); 3A A. L. Corbin, Contracts § 755 (1960); L. P. Simpson, Handbook on the Law of Contracts § 132 (1954); Restatement of the Law of Contracts, § 309, pp. 456–58 (1932).[10]

Therefore the stevedore is obligated to indemnify the shipowner under the express contractual indemnity.

■■■ 6. The stevedore's knowing continued use of the unseaworthy winches constituted a breach of the stevedore's implied contractual warranty to tender the shipowner a "good and workmanlike" performance. Ryan Stevedoring Co., Inc. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); T. Smith and Sons, Inc. v. Skebs A/S Hassel, supra; Olin Mathieson Chemical Corp. v. United Stevedoring Division, States Marine Lines, Inc., supra; Simpson v. Royal Rotterdam Lloyd, supra; Nicroli v. Den Norski Afrika-Og Australiene, etc., supra; C. O. Bue, supra, at 410–412; S. Krebs, Note, 7 Hou. L.Rev. 137 (1969).[11]

■■■ 7. Although the shipowner's tortious acts were proximate causes of the plaintiff's injuries, they did not constitute such a substantial interference with the stevedore's ability to tender a workmanlike performance that they precluded the shipowner recovering indemnification due to the stevedore's breach of its implied warranties.

As a corollary to the Ryan doctrine, the Supreme Court has made it clear that a shipowner has certain contractual obligations under its contractual relationship with the stevedore. The concept finds its roots in Weyerhaeuser S/S Co. v. Nacirema Operating Co., 355 U.S. 563, 567, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Here the court said that indemnity would not be allowed if the shipowner's conduct were "sufficient to preclude indemnity." The court did not specifically define what conduct was "sufficient" but intended that the trier

---

demnities § 37 (1968); 30 T.J.2d Indemnities § 24 at 468 (1962); c. f.: Wells Benz Inc. v. United States, 333 F.2d 89 (9th Cir. 1964); Eckert v. Jackson, 197 F.2d 35 (2nd Cir. 1952) (per curiam); LeRoy Dyal Co. v. Allen, 161 F.2d 152 (4th Cir. 1947); Atlantic Refining Co. v. Continental Casualty Co., 183 F.Supp. 478 (W.D.Pa.1960).

The facts here are substantially different from those in Pettus v. Grace Line, Inc., 305 F.2d 151, 154 (2nd Cir. 1962); and I conclude that the shipowner's conduct there was a less substantial cause of the accident.

10. The shipowner's failure to plead waiver is not a procedural defect to be considered after trial. Since the fact issues litigated weigh upon the issue of waiver, it can be implied that the parties consented to the trial of this issue. F.R.Civ.P. 15(b). Albert v. Joralenon, 271 F.2d 236, 241 (9th Cir. 1959); Pasquel v. Owen, 186 F.2d 263, 271 (8th Cir. 1950); c. f.: Metropolitan Life Insurance Co. v. Fugate, 313 F.2d 788, 795 (5th Cir. 1963).

11. The express indemnification provision in the stevedoring contract did not contain language specifically precluding recovery under the stevedore's implied contractual warranty. Therefore, recovery based upon *either* the express or implied contractual provisions, or both, is appropriate in this case. Italia Society Per Azioni Di Navigazione v. Oregon Stevedoring Co., 336 F.2d 124, 126–127 (9th Cir. 1964); cert. den. 379 U.S. 973, 85 S.Ct. 668, 13 L.Ed.2d 565 (1965); Pettus v. Grace Line, 305 F.2d 151, 155 (2nd Cir. 1962); Di Paola v. Int. Terminal Operating Co., 311 F.Supp. 685, 688 (S.D.N.Y.1960); Brattoli v. Kheel, 302 F.Supp. 745, 753 (E.D.N.Y.1969); *but c. f.:* D'Agosta v. Royal Netherlands S/S Co., 301 F.2d 105, 107 (2nd Cir. 1962); C. O. Bue, supra, 412–413.

of fact should use contractual theories to make this determination.

The Fifth Circuit has adopted an approach of weighing the reciprocal duties which the stevedore and shipowner owe to each other. Southern Stevedoring Co. and Contracting Co. v. Hellenic Lines, Ltd., 388 F.2d 267, 271–272 (5th Cir. 1968). In this case the court stated:

> * * * the trier of fact must weigh the substantiality of the fault of the shipowner against the breach of warranty by the stevedore to determine whether the former's conduct is 'sufficient to preclude indemnity.' Waterman Steamship Corp. v. David, supra [353 F.2d 660 (5th Cir. 1965)].

The rule which has been forged for application in this process is that only conduct on the part of the shipowner which prevents the stevedore's workmanlike performance is sufficient to preclude. indemnity.

*Id.,* 271–272; Grigsby v. Coastal Marine Services of Texas, Inc., 412 F.2d 1011, 1040–1041 (5th Cir. 1969); cert. denied sub nom. Fidelity & Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1969).

In Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 324, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), the Supreme Court articulated another standard which the trier of fact should consider when determining if conduct of the shipowner should preclude his recovery of indemnity. *See:* Olin Mathieson Chemical Corp. v. United Stevedoring Division, States Marine Lines, Inc., supra. The court stated, "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury."

■ In a case such as this one the Court would prefer to require the stevedore and the shipowner to contribute proportionately toward plaintiff's injuries. However, since contribution is improper, Halcyon Lines v. Haenn Ship Ceiling and Refilling Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Court has concluded that the stevedore has breached its warranty of workmanlike service and must indemnify the shipowner. The stevedore was in the better position to prevent the accident. Its failure to cease using the winches was the cause of the injury to plaintiff.

■ 8. The shipowner and stevedore failed to meet their burden of proof. The evidence fails to preponderate to a conclusion that Jackson was contributorily negligent. When injured, Jackson was performing his assigned task in the manner best suited to accomplish his mission and to insure his personal safety. In this case Jackson's continued performance of his assigned task—knowing it to be a potentially dangerous one —did not constitute contributory negligence. He was ordered to assume the guide position by his employer's supervisors. If Jackson had refused to perform his assigned task, it is reasonable for this Court to infer that his future employment as a longshoreman in Galveston, Texas, would have been jeopardized. As the accident occurred suddenly and without warning, Jackson did all that he could do under the circumstances to protect himself from injury. *See:* Burrage v. Flota Mercante Grancolombiana, S.A., 431 F.2d 1229, 1232 (5th Cir. 1970); Simpson v. Royal Rotterdam Lloyd, supra, at 950; W. Prosser, Handbook of the Law of Torts, § 64 (3rd Ed. 1964).

The Clerk will send copies of this Memorandum Opinion and Order to counsel and notify counsel of a future setting in this cause, at which time the Court will hear evidence on the issue of damages.